ILLINOIS CEREAL MILLS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Illinois Cereal Mills, Inc. v. Commissioner
Docket Nos. 1619-76, 3013-79.
United States Tax Court
T.C. Memo 1983-469; 1983 Tax Ct. Memo LEXIS 316; 46 T.C.M. (CCH) 1001; T.C.M. (RIA) 83469; August 11, 1983. Warren C. Seieroe, for the petitioner. Stephen J. Morrow, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioner's corporate income taxes as follows: Fiscal Year Ending
Deficiency
9/30/72
$78,773.41
9/30/73
371,139.04
9/30/74
606,078.18
9/30/75
176,717.11
9/30/76
83,330.84
After numerous concessions by both parties as set out in their stipulation of issues and first supplemental stipulation of issues, the following issues remain for our decision: 1. Whether certain corn represented by warehouse receipts is properly includable in petitioner's year-end LIFO inventory; 2. Whether the price petitioner paid to purchase a competitor's *318 Mogul binder business is allocable among the various intangible assets acquired, and, if so, the various tax consequences of such an allocation; 3. Whether structures housing certain industrial processes qualify as "section 38 property" [1] for purposes of the investment tax credit, and whether the useful lives of such structures for purposes of computing depreciation are the same as the useful lives of the machinery and equipment within the structures or independent of the useful lives of such machinery and equipment; [2] and 4. Whether certain grain storage tanks owned by petitioner's subsidiary are assets that come within Asset Guideline Class "01.1" for purposes of determining their depreciable useful lives. [3]
*319 FINDINGS OF FACT Some of the facts have been stipulated and are so found.The stipulation of facts, first supplemental stipulation of facts, second supplemental stipulation of facts, and all exhibits attached thereto are incorporated herein by this reference. Illinois Cereal Mills, Inc. (herein ICM) is a Delaware corporation with its principal office and place of business at Paris, Illinois, for all times relevant hereto. ICM filed its corporate income tax returns using the accrual method of accounting for its fiscal years ending September 30, 1972 through and including September 30, 1976, with the Midwest Service Center at Kansas City, Missouri. ICM's principal business activity is the operation of a corn milling business. Incident to this business ICM purchases shelled corn which it processes into various products including meals, grits, flakes, flours, oil, starches, and hominy as well as certain specialty products. These products are used by a number of different industries including food manufacture, brewing, industrial products, and animal food. I. LIFO Inventory--Warehouse Receipts
ICM operated a large corn mill in Paris, Illinois, during the years in issue *320 and for many years prior thereto. In its business ICM purchased and processed vast amounts of shelled corn. ICM had storage capacity for about 1.2 million bushels of shelled corn. Because of the large quantities of shelled corn it processed to make its finished goods and because of its lack of storage capacity for finished goods or for the various particle sizes left over after a production run, ICM's production in excess of existing orders at any given time was sold as "hominy feed," which was used as an animal feed. Although subject to certain variables, hominy feed usually sold for about $10 per ton less than raw corn. Generally, for a dry miller such as ICM that breaks up the corn by mechanical rather than by chemical means, "new corn" from the recent harvest has better milling qualities than "old corn" from the prior year's growing season. Generally, unless the "new corn" comes from a particularly bad harvest year, the new corn will result in fewer fine particles of the type that ICM could only dispose of as hominy feed. The corn harvest usually begins about mid October to early November in ICM's geographical area, and in 1974 there was a premature frost that suggested that *321 the new corn to be harvested that year would be of an inferior quality. During all of the years involved and for many prior years, ICM used the LIFO method of valuing its inventories of corn. As of September 30, 1973, ICM included the following in its ending LIFO inventory of corn: Corn and hand
312,700 bushels
Corn-in-transit
240,129 bushels
Warehouse receipts
200,315 bushels
TOTAL
753,144
The warehouse receipts mentioned above resulted from a transaction with Cargill, Inc. ("Cargill"). During September 1973, ICM's physical inventory of corn was substantially lower in quantity than it had been at the beginning of the taxable year. ICM, by telephone, entered into a transaction with Cargill on September 28, 1973, whereby six warehouse receipts, representing 200,315 bushels of No. 5 yellow corn, would be transferred to ICM on September 28, 1973 and these receipts would be subsequently transferred back to Cargill on October 1, 1973. The corn represented by the warehouse receipts was held at all times by Cargill at its elevators in Chicago, Illinois. At no time did ICM intend to take delivery of the corn in-kind, but, on the contrary, intended at all times *322 to deliver the six warehouse receipts back to Cargill on October 1, 1973, as was required by the September 28, 1973 agreement of the parties. As of September 30, 1975, ICM included the following in its ending LIFO inventory of corn: Corn on hand
293,000 bushels
Warehouse receipt
600,000 bushels
TOTAL
893,000 bushels
The warehouse receipt mentioned above resulted from a transaction with The Andersons. During September 1975, ICM's physical inventory of corn was substantially lower in quantity than it had been at the beginning of the taxable year. ICM, by telephone, entered into a transaction with The Andersons on September 29, 1975, whereby a warehouse receipt, representing 600,000 bushels of No. 2 yellow corn, would be transferred to ICM on September 30, 1975, and subsequently transferred back to The Andersons on October 1, 1975. The corn represented by the warehouse receipt was at that time the "old corn" of inferior quality from the preceding 1974 growing season and was held at all times by The Andersons at its elevators. At no time did ICM intend to take delivery of the corn in-kind, but, on the contrary, intended at all times to deliver the warehouse *323 receipt back to The Andersons on October 1, 1975, as was required by the September 30, 1975 agreement of the parties.
The transactions with Cargill in 1973 and The Andersons in 1975 involved exchanges of warehouse receipts, purchase confirmations, sales confirmations, and checks. After the initial telephone contact in each instance, all that was left to be undertaken by the parties to the transactions was the mechanical steps of exchanging matching and reversing confirmation slips, the delivery and redelivery of warehouse receipts, and the exchange of checks. ICM's actual cash expenditures in these transactions were limited to $1,368.16 in 1973 (ICM's draft for $492,776.18 less Cargill's draft for $491,408.02) and to $3,000 in 1975 (ICM's check for $1,698,000 less The Anderson's check for $1,695,000). Frank Wiggins ("Wiggins"), ICM's executive vice-president at the time, and a Mr. Buchanan ("Buchanan"), who worked in ICM's grain department, discussed these 1973 and 1975 acquisitions of warehouse receipts before ICM contacted either Cargill or The Andersons. During these discussions, both Wiggins and Buchanan knew that ICM would not be able to take delivery of the corn represented *324 by the warehouse receipts and that the only way for ICM to get title to the corn was to agree to sell it back to Cargill and to The Andersons so that the corn would never leave their elevators. ICM's purpose in acquiring the corn represented by these warehouse receipts was not to gain corn inventories to move into production, but simply to avoid the adverse tax consequences of having a closing LIFO inventory amount smaller than the beginning amount (i.e., avoid the "liquidation" of its LIFO base). In his notices of deficiency, respondent determined that the corn represented by these warehouse receipts should not have been included in ICM's year-end LIFO inventories. The result of this determination was a year-end inventory of corn in an amount less than the beginning inventory, causing a liquidation or recapture of ICM's LIFO inventory base. [4] Accordingly, respondent decreased ICM's deduction for cost of goods sold and increased its income for the fiscal years ending September 30, 1973, September 30, 1974, and September 30, 1975. [5] Respondent's determination also resulted in an increase in ICM's deduction for cost of goods sold for the fiscal year ending September 30, 1976, reducing *325 its taxable income for that year. *326 II. ICM's "Mogul" Purchase
One aspect of ICM's business is the production and sale of cereal binders, a specialty product used primarily in the foundry industry. Prior to February of 1974, ICM produced and sold cereal binders under the names Ceres, Cereatim, and 940. CPC International, Inc. ("CPC") is a large multinational corporation having extensive corn-processing facilities in the United States, including plants at Argo, Illinois, Pekin, Illinois, and North Kansas City, Missouri. Prior to February of 1974, CPC produced and sold cereal binders under the name "Mogul" that competed directly with ICM's binders, particularly ICM's 940. CPC was a "wet" miller that milled corn by chemical means. During 1973, CPC had become dissatisfied with the profitability of a group of its products, called the pre-gelatinized starches, which included its cereal binder, Mogul. Late in 1973 or very early in 1974, CPC decided to dispose of this line of business. CPC also decided to try to sell its Mogul business to one of the dry corn millers who produced competing products. CPC put together a "package" to sell as its Mogul business, which package included customer lists, production *327 equipment if the buyer wanted it, the Mogul trademarks (registered) and trade name production specifications and technical information for the Mogul binder, sales assistance in the transition from CPC to the buyer, including personal calls upon larger customers, and "technical help in manufacturing or product use." The first dry corn miller CPC approached was ICM. In late January of 1974, CPC telephoned Joseph Hasler ("Hassler"), ICM's sales manager at that time, inquiring whether ICM was interested in purchasing CPC's Mogul cereal binder business. Hasler informed CPC that ICM was indeed interested. Hasler then met with Wiggins, ICM's executive vice-president, to discuss the offer and the two decided to "take the next step." On or about January 30, 1974, Hasler and Ken McFall ("McFall"), ICM's sales service representative, met with CPC officials at the CPC corporate headquarters at Inglewood Cliffs, New Jersey, to discuss the offer. CPC repeated the general terms of its offer and stated that the price was $300,000. Hasler, for ICM, tentatively agreed to the purchase price of $300,000. CPC required this tentative agreement before it would provide any information about *328 Mogul's technical qualities, product specifications, or production methods. After they tentatively agreed to the purchase price, CPC gave Hasler some rudimentary information regarding business volume, specifications, and general production methods.
Hasler prepared a memorandum, dated February 1, 1974, outlining CPC's proposal as follows: CPC Idea
Basically their deal is this. They are willing to sell us all their trade marks for Mogul and the logo, which is registered for the U.S.
They will provide complete customer files edited to delete only proprietary information which might relate to other areas of their business. They will provide all of their technical and research information. Everything they have relating to Mogul will be turned over to us. Equipment can be available if we want any part of it. Customer lists, prices paid, etc. Some technical help from their production people if required. Joint sales calls on key customers and a letter from them to all customers spelling out the transition. Assisting us in securing as much of the existing business as possible. They will help us in securing the necessary bags if this is a problem as well as *329 any other problem areas (within reason) which may come up. Hasler's memorandum briefly described CPC's manufacturing process, and his description indicated that CPC's production of Mogul was almost a by-product of its overall wet milling process. The memorandum indicated that the feedstock for the Mogul production was the third level or third cut within CPC's slurry, consisting of 9 to 15 percent protein and starch in the slurry solution. Hasler's memorandum also provided fairly detailed product specifications for Mogul. The memorandum did not suggest that the feedstock for the Mogul was pure starch which was the fourth level or cut in CPC's slurry. Finally, the memorandum conveyed basic general sales and volume figures. The memorandum does not specifically mention a covenant not to compete. The memorandum stated that CPC wanted to make a final decision on the deal prior to February 14. Approximately one week later, on or about February 6, 1974, Hasler and McFall visited CPC's plant in Argo, Illinois, where CPC produced its Mogul binder. They toured the plant and discussed essentially the same topics that had been discussed at the first meeting. ICM obtained a little more *330 information regarding Mogul's specifications, and ICM "cleared up [its] thinking a little bit on [the] manufacturing process," but the record does not indicate exactly what additional information was obtained at that time. Afterwards, Hasler and Wiggins met and decided that they wanted "to consummate the deal, and so advised CPC." At a special meeting on February 8, 1974, ICM's board of directors approved the following resolution: RESOLVED, that the Officers of Illinois Cereal Mills, Inc. are hereby authorized to take such action as necessary, and to enter into negotiations and culminate a contract to acquire the CPC binder business and to incur such capital costs to produce the additional binder involved, all as set forth in the proposal dated February 8, 1974 attached. The proposal referred to in the ICM Board's resolution provided: February 8, 1974 CPC Binder Proposal
CPC is desirous of disposing of their binder business primarily covered by their "Mogul" trademark, brands, etc.
They propose selling all of this business to us for $300,000 and will render such assistance as necessary to implement an orderly transfer. They also would continue production, sales, *331 etc., or any part thereof up to January 1, 1975. This business would complement and more than double our present specialty business which competes with them. The additional volume to be gained by us in acquiring this business is estimated to be 342,000 cwt. per year. After this acquisition our business would be anticipated to total 637,500 cwt./year. To acquire this business and make this additional production necessitates removal of our specialty department from the corn mill. If we are going to stay in the specialty business this move has to be made in any event in order to complete modernization of our mill. Neither the Board resolution nor the "CPC Binder Proposal" makes any express reference to a covenant not to compete. On February 13, 1974, Wiggins and Hasler met with Robert Gillespie, then CPC's vice-president in charge of its starch business, Merle Mentzer, CPC's business manager for its starch business, and Robert Wells, CPC's attorney, to close the sale. Before this meeting, ICM had neither received nor inspected any proposed contracts of sale, any legal documents relating to the trademarks, any copies of the Mogul customer list, any credit data, or any additional, *332 more specific technical information regarding CPC's manufacture of Mogul. On February 13, 1974, CPC and ICM entered into two agreements--the Purchase Agreement, involving ICM's acquisition of CPC's Mogul intangible assets, for the sum of $240,000 and the Manufacturing Agreement, for the sum of $60,000. The Purchase Agreement provided as follows: NOW, THEREFORE, is consideration of the mutual promises and covenants contained herein, it is mutually agreed as follows: 1. Sale of Business. Seller hereby sells, and Buyer hereby buys, Seller's MOGUL Cereal binder business in the present States of the United States, including its good will and the business assets enumerated in Paragraph 3 below (the "Business Assets", for the consideration stated in Paragraph 2. 2. Purchase Price. Buyer agrees to pay Seller a purchase price of Two Hundred and Forty ($240,000) Thousand Dollars payable on the execution hereof; 3.The Business Assets. The Business Assets hereby sold to Buyer consist of the following: (i) U.S. Registered Trademark "MOGUL" (Word), Reg. No. 241,992 (assignment to Buyer attached as Appendix A); (ii) U.S. Registered Trademark "MOGUL" (Word and Bull's *333 Eye Device), Reg. No. 503,618 (Assignment to Buyer attached as Appendix B); (iii) Seller's specification sheet and manufacturing procedure for its "MOGUL" brand cereal binder (Appendix C) and copies of current technical data relating to this product; and (iv) Seller's customer list and credit data connected therewith for "MOGUL" brand cereal binder, consisting of all customers who have purchased this product from Seller during the two year period ending January 31, 1974 (Appendix D). 4. Customer Notification. Promptly after the execution hereof, Seller shall mail a letter to all customers on the customer list, in the form attached as Appendix E, advising that Seller has sold its cereal binder business in the United States to Buyer and recommending that they continue to buy "MOGUL" brand cereal binder from Buyer. In addition, Seller shall participate with Buyer in making one joint sales contact with all major customers on the customer list during the period ending July 1, 1974. 5. Covenant Not to Compete. Seller shall not for a period of five (5) years from the date hereof (i) engage in the sale of cereal core binders in the United States having a composition *334 substantially similar to that of its MOGUL cereal binder or (ii) use "MOGUL" or any substantially similar trademark or trade name in connection with the sale in the United States of any binder material. * * * The manufacturing procedures attached to the Purchase Agreement identified the CPC feedstock as 80 percent stripper starch and 20 percent thick boiling tailings. The manufacturing data also indicated that dye was added to give the Mogul its yellow color, whereas ICM's 940 binder got its yellow color from the yellow goods (corn grits) used as feedstock. The Manufacturing Agreement [6] provided in pertinent part: NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, it is mutually agreed as follows: 1. During the period from the execution hereof until July 1, 1974, and from month to month thereafter if Buyer's business requirements so necessitate, but in no event after December 31, 1974, Manufacturer will continue to manufacture and make available to Buyer such quantities of MOGUL at up to current quantities to customers on the customer list for as long as it is required to supply an amount of not less than 1.6 million pounds of product *335 per month * * * * * * 2. * * * During the period ending no later than December 31, 1974, Manufacturer shall cooperate with Buyer in handling or referring inquiries from potential customers for MOGUL cereal binder, as Buyer may direct. 3. Buyer shall pay Manufacturer a service fee for its manufacturing services in the amount of sixty thousand dollars ($60,000.00) upon execution hereof. * * * Covenant Not to Compete
Wiggins, who negotiated the deal for ICM, is an attorney and had been ICM's tax attorney before becoming a corporate officer. CPC's attorney, Wells, participated in the negotiations. The record does not establish the reason for the allocation of the $300,000 purchase price between the Purchase Agreement and the Manufacturing Agreement. ICM did not employ an appraiser to determine the value of any specific asset it purchased from CPC, either individually or as part of the entire Mogul "package." Neither ICM nor CPC sought to allocate, purported to allocate, or discussed *336 the allocation of the $240,000 purchase price among the various intangible assets reflected in the Purchase Agreement. [7] Neither Wiggins nor Wells discussed the tax consequences of such an allocation, or of the parties' failure to make such an allocation. From the outset of the negotiations, it was clear that CPC intended to terminate its cereal binder business. Nonetheless, the covenant not to compete was of considerable value to ICM: CPC was still selling resin-coated sand in the foundry market in competition with cereal binders. Because of this, CPC still had business contacts in ICM's markets, and because of its size, had the ability to re-enter the cereal binder market. Moreover, *337 CPC had an excellent reputation in the market. Because of this, the covenant was quite valuable to ICM but was not the only item of value received in the purchase of the Mogul binder business. Technical Data
Cereal binders are used primarily in the foundry industry. The binder is mixed with sand, water, and other materials, formed into a core, dried, and baked. Into the finished mold is poured molten metal; the core allows the metal to form around what will be a hollow spot. After the metal hardens into the desired shape, the used core is broken or disintegrates back into granular sand and is thus removed from the mold. The most important characteristic of a binder is its adhesive quality, namely, its ability to hold together the sand and other materials in the core. "Viscosity" is a measure of the resistance or friction of fluid that flows in fluid systems. Viscosity is a useful test to determine the adhesive qualities of a binder, and the greater the viscosity, the better the binding action and the less binder material is needed for binding. "Water absorption" refers to the amount of water taken up by a given amount of a substance. Although viscosity and water *338 absorption are scientifically different, there is a rough correlation between the two in cereal binders--higher water absorption figures generally tend to accompany higher viscosity figures, and lower water absorption figures generally tend to accompany lower viscosity figures. However, material that has been overcooked in the gelatinization process, as will be discussed below, can have high water solubles and low viscosity. For a producer of cereal binders like ICM, viscosity ranges (high v. low) may be more important than a specific viscosity figure. In testing cereal binders, ICM usually measured water absorption and from those measures roughly extrapolated general viscosity ranges. Starch granules must be modified or cooked by some method in order to provide the requisite adhesive qualities to serve as a foundry binder. This process is called "gelatinization." Starch granules are tempered (moistened), and as these granules imbibe water they swell to many times their natural size. Each of these granules contains thousands of starch molecules, which are very large molecular structures. Heat enhances the absorption of water into the starch granules. Eventually, the heat and *339 water cause the starch granules to break, releasing long molecular chains of starch. At this point, the starch is said to be "gelatinized." The friction of these molecular chains rubbing against each other generates the adhesive properties of a cereal binder, and viscosity measures this molecular friction. The longer the chains of starch molecules, the higher the viscosity levels, which means greater adhesive strength in the binder. After these molecular chains of starch have been released, they become quite fragile. Shearing forces or excessive temperature at that point will cause a degeneration of these molecular chains, resulting in lower adhesive strength measured by lower viscosity levels. Consequently, to produce a binder with the best adhesive strength requires somewhat mild temperatures and a minimization of shearing forces. Prior to its acquisition of Mogul from CPC, ICM produced its cereal binders in two ways. ICM produced its Ceres and Cereatim binders through its "hot roll" process. ICM started with its No. 5 or No. 6 grits (yellow goods) as feedstock. This feedstock was composed of large chunks of corn, which were the end of result of ICM's initial processing of *340 shelled corn, whereby the hull was broken, the germ and fiber separated, and the endosperm split. [8] This feedstock was tempered (moistened), and then transferred onto two counter rotating steel rolls, which were heated externally by gas fired flames. The rolls actually came into contact with each other. The tempered feedstock flowed into the nip (the point where the two rolls contacted each other) and emerged in a flattened, ribbon-like state. This material was then dried and ground into a fine powder, which was the end product, namely, the binder. The density (weight per unit of volume) of binders produced in this method could be varied by varying the pressure of the rolls used to cook the feedstock. Because the rolls came into contact with each other, there was a certain amount of *341 shearing force created. Some shearing force was necessary in ICM's hot roll process. In ICM's feedstock (Nos. 5 and 6 grits), the starch granules were encased in a protein matrix, and shearing force broke down this protein matrix so that the water could reach the starch granules. The moisture could not reach the starch granules until the protein matrix had been breached. An unavoidable consequence of this use of shearing force to break down the protein matrix was that there was also some degradation of the long starch molecule chains, reducing somewhat the adhesive qualities of the resulting binder.
During the early 1960's ICM began experimenting with the production of gelatinized corn products by means of an extrusion process rather than the hot roll process. Two principal advantages of an extrusion process were that an extrusion machine would handle much greater volume and it would accept a much more varied feedstock, a meal rather than the Nos. 5 and 6 grits required for the hot roll process. This would permit the conversion into prime products of ingredients otherwise destined to be sold at a loss as hominy feed. ICM's first extruder was a V.D. Anderson model which was *342 a rather simple and inexpensive device. ICM's feedstock for this extruder was "west end meal," a fine corn meal (40 to 60 grits) left over from other milling operations, and otherwise destined to be sold as hominy feed. This feedstock was first tempered (moistened) with water or steam and conveyed in a steam-jacketed conveyor into the extruder. The material was passed through the barrel of the extruder by means of the turning of a screw. Each flight of the screw was increasingly closer together. In this manner, the material would compact at the end of the screw where pressure was built up. The heat source was generated by the friction of the screw, and could be adjusted and controlled somewhat by external bolts, which varied the size of the flights through which the screw passed. As with ICM's hot roll process, a certain amount of shearing force was necessary to break down the protein matrix surrounding the starch granules so that the starch could gelatinize. However, the Anderson extruder generated excessive heat and shearing force, so that when it broke down the protein matrix, it also degraded the released starch molecule chains, thus reducing the adhesive qualities of *343 the resulting binder. ICM discovered that it could enhance the adhesive qualtities of its extruded binder by mixing with it the output from its hot roll process and an additive. In the pure hot roll product, relatively long starch molecule chains predominated, while in the pure "Anderson" extrusion product, relatively short starch molecule chains predominated. The additive served to re-engineer these starch chains by cross-linking the long chains of the hot roll product with the short chains of the extruded product. This resulted in very long molecule chains, and a binder with high adhesive properties as measured by high viscosity levels. ICM sold this binder under the name 940. Unlike ICM, which was a "dry" miller, CPC was a "wet" miller. In wet mills, shelled corn is initially treated with a sulphuric acid solution which breaks down the protein matrix or structure of the kernel into a slurry solution. CPC then separated the various components (starch, protein, and oil) out of the slurry solution. In dry mills, the milling is done mechanically rather than chemically with the kernel being physically broken, to permit the separation of the hull, the oilbearing germ, and the *344 starch-bearing endosperm. In a wet mill such as CPC's, the chemical process also breaks down the protein matrix encasing the starch granules, so that shearing forces, like those necessary in ICM's milling, are not required to allow gelatinization of the starch. The feedstock for CPC's method of producing its cereal binder was a lower grade of starch, with some protein, still in slurry solution form. This solution was heated to 124 degrees Farenheit, filtered and dried somewhat (to reduce the moisture content), and then conveyed to steel rolls. These rolls flattened the material, which was then flaked, dried, and ground. Unlike the hot rolls that ICM used, CPC's rolls were heated by a steam jacket. Moreover, instead of the rolls being in contact at the nip, CPC's rolls had a gap of about two millimeters, which minimized the shearing forces that resulted from the rolls. As early as 1964, ICM had regularly run lab tests analyzing the essential properties of Mogul and other competing binder products and this data was kept on file. Jack Swarthout has been ICM's director of research and product development since 1967. At the time he joined petitioner he had extensive training and *345 experience in the field of microbiology, and particularly in starch synthesis and technology. Swarthout was well aware of the effects of the Anderson extruder in breaking down the starch molecular chains and also had formulated the blend of material and the additive to counteract these effects in ICM's 940 binder. During 1968 Swarthout had conducted laboratory tests looking to the production of foundry binders by an all-extruder process. To this end he employed a steam-jacketed extruder which avoided the "over working" problems of the Anderson extruder, which did not have a steam jacket. These tests convinced him that a good quality binder comparable to ICM's 940 could be produced entirely from extruder-produced material. Swarthout had also visited the facilities of the two manufacturers of steam-jacketed extruders, Bonnot and Wenger, and conducted tests on their equipment. Up until the purchase of CPC's Mogul and until ICM's technical people (including Swarthout) saw CPC's Mogul process, ICM believed that CPC's production methods, know-how, and product technical data would have some value to it. At the time of the initial CPC officer, ICM knew that CPC was a wet miller, not *346 a dry miller like ICM. Swarthout understood the fundamental differences between dry milling and wet milling. Swarthout had seen Hasler's memorandum of February 1, 1974, which indicated that CPC's milling process was quite different from ICM's. However, Hasler was a salesman, not a technical person, and Swarthour kept a relatively open mind until he had actually seen CPC's plant on February 21, 1974, after the sale. At that time he learned what the CPC feedstock was made of and that ICM had no feedstock comparable to it. Mogul's yellow color, which ICM then learned was produced by a dye, had seemed to indicate the contrary, namely a manufacturing process comparable to ICM's. ICM did not acquire any of the equipment CPC used to produce Mogul, even though it was available as part of the "package" if ICM had wanted it. Following the acquisition when Swarthout visited CPC's Argo facility where it produced Mogul, it was immediately apparent to him that there was nothing in CPC's methods that could be readily adapted to ICM's use. The CPC facility was designed to process a feedstock consisting of free starch parties (with some protein) in a slurry solution, which was radically different *347 from any feedstock that could be produced by ICM's dry milling process. Under the Manufacturing Agreement, CPC was to continue to produce Mogul for ICM until December 31, 1974, or until ICM was able to go on line with its own Mogul production. By April 5, 1974, Swarthout had determined that ICM could produce a commercial quality binder comparable to its 940 product, using solely an extrusion process, but "still [had] not resolved whether a Mogul-like product [could] be made in this manner." Swarthout advised ICM's president that: A foundry binder made on an extruder will never be identical to Mogul B211 in all respects. There are many differences between Mogul B211 and extruder products, such as: pH, water solubles, protein content, pasting qualities, starch content, density, etc. We are now trying to sort out the important differences (from foundry binder and Sales aspect) from the unimportant differences which arise when producing Mogul by a wet starch process on hot rolls. We would like to have some guidance from Sales concerning which of the above factors are critical. This is needed before a final method for our Mogul production can be decided upon.
By September 30, 1974, ICM *348 had more or less committed itself to making its new binder, to be sold under the name Mogul, solely through an extrusion process. ICM went on line with its own Mogul production in January of 1976. [9] At this time, ICM produced its Mogul product solely through an extrusion process using an extruder made by Bonnot. Unlike the Anderson extruder, which ICM had used previously, the Bonnot extruder was steam-jacketed, and fed at 150 pounds per square inch steam pressure, providing an external source of heat.This use of external heat meant that the extruder was not required to generate heat internally through friction, and this reduced friction also greatly reduced the shearing forces. Because of the reduced shearing forces and lower temperatures, the breakdown of the long starch molecular chain was lessened, resulting in a binder with better adhesive properties than that produced by the Anderson extruder. Initially, ICM sold as Mogul the pure product produced by the Bonnot extruder; in later years, about 1978, ICM introduced an additive (the same one used in its 940 binder) to enhance Mogul's adhesive properties. ICM developed its method of producing Mogul largely through its own *349 research, technology, and experience, but may have used some of the technical data and information it obtained from CPC in producing its own Mogul product. When ICM began selling its own Mogul product, it advised its customers that: Mogul was developed from over 50 years research. It is well known in the industry as a high-quality product. Illinois Cereal Mills purchased the brand name and technical information necessary to produce Mogul. We are now manufacturing Mogul to the same high exacting standards. The record does not establish that ICM abandoned any technical data or information it purchased from CPC.
Customer List
Another of the assets that ICM acquired from CPC was a list of customers to whom CPC had sold Mogul in the two years prior to 1974. ICM had hoped that the CPC customer list would disclose a new untapped source *350 of customers for its products, but discovered that it was already selling its own products to most of those CPC customers. This CPC customer list contained 440 customers. During 1973, the year before ICM acquired the Mogul business, CPC had shipped 43,249,400 pounds (432,494 cwt. [10]) of Mogul to those 440 customers. In the Manufacturing Agreement, CPC agreed to manufacture and supply Mogul to ICM until ICM went on line with its own production, or until December 31, 1974. ICM's existing plant was inadequate to manufacture enough binders to supply both its own customers and the Mogul customers it acquired from CPC. Consequently, ICM drafted plans for, and began the construction of, a new production facility in which it would produce both its former binder products and its own Mogul. ICM had anticipated that this facility would be operational before the Manufacturing Agreement expired. The new specialty mill did not become operational until January 1976, when ICM came on stream with its production of Mogul. Approximately four months after ICM purchased the Mogul business, CPC had a strike at its Argo plant and was unable to continue *351 the manufacture and supply of Mogul pursuant to the Manufacturing Agreement. ICM immediately acquired the remaining supply of Mogul that CPC had on hand. CPC never again produced Mogul for or on behalf of ICM. For the rest of ICM's fiscal year 1974, the CPC-produced Mogul was shipped to the Mogul customers on behalf of ICM. In order to continue supplying binders to Mogul customers while the new facility was under construction, ICM, during its fiscal year 1975, produced a substitute binder, SB-311, consisting of a combination of 940, Ceres, an additive, and extruded binder material it purchased from a competing dry miller. ICM did not use the "Mogul" name for this substitute binder. Despite its best efforts, ICM was unable to produce or procure its substitute binders in sufficient quantities to satisfy the requirements of all Mogul customers, so it sought to allocate the available product to supply those who had no alternative source. Had it been available, ICM could have sold approximately twice as much SB-311 as it did in 1975 and 1976. ICM produced and sold SB-311 in the amounts of 117,953 cwt. in its fiscal year 1975 and 67,618 cwt. in its fiscal year 1976. Its production *352 of its own Mogul binder came on line in January of 1976 and sales of SB-311 thereafter fell off sharply to 16,984 in 1977, 12,691 in 1978, 9,435 in 1979, and 3,608 in 1980.However, ICM produced and sold 81,129 cwt. of Mogul in its fiscal year 1976.Production and sales of ICM-produced Mogul thereafter increased to 200,246 for 1977, 211,025 for 1978, and 330,698 for 1979 before declining to 236,393 for 1980. The shipments of Mogul and the Mogul substitute (SB-311) to CPC's former Mogul customers and total shipments of Mogul and Mogul substitutes were as summarized below: Total Sales
Mogul & SB-311
to All Customers
Sales to CPC Mogul Customers
Fiscal
cwt. as
No. of Customers
Year
% of CPC
as % of CPC
Ending
cwt.
cwt.
No.
1973 Sales
1973 Customers
[11] 1973 432,494
432,494
440
100%
100%
[12] 1974 132,043
132,043
258
31%
59%
9-30-75
125,766
125,766
57
29%
13%
9-30-76
148,747
138,901
59
32%
13%
9-30-77
217,230
168,248
55
30%
13%
9-30-78
223,716
138,655
46
32%
10%
9-30-79
340,133
173,926
44
40%
10%
9-30-80
240,001
114,627
42
27%
10%
*353 ICM marketed its new extrusion process binder under the brand name "Mogul" and continues to this day to produce, market, and advertise a binder under the brand name "Mogul." To assist ICM in the transition with the customers, CPC had agreed to make joint sales calls on key customers with petitioner's personnel, to explain the transition and provide their comments as to why they sold the business to ICM. In addition, CPC would provide technical sales service calls if necessary. Prior to the strike, CPC made telephone calls to customers, written communications, and a limited number of personal calls on customers. ICM contacted the new customers primarily by letter in conjunction with CPC correspondence. In addition, personal contacts were made with the major customers. When ICM finally commenced its own production of Mogul in January 1976, Dave Longeville, CPC sales administrator, made some contacts with former Mogul customers, in furtherance of CPC's agreement to assist ICM in the transition of the customers. Through the acquisition, ICM had hoped to acquire many new customers that it did not know about, and had hoped that it would secure some of them in the transition. ICM *354 placed great value on this customer list at the time of its Mogul acquisition, for it considered the acquisition of CPC's Mogul customers to be one of the principal purposes of the deal. Most of the customers contained on the list were already customers for ICM's other binder products, such as Ceres, Cereatim, and 940. ICM continued to sell these products to a "significant percentage" of these customers after its purchase of the Mogul business. The record does not establish for any of the post-1974 years the amounts of binders, other than Mogul and SB-311, that ICM sold to customers on CPC's Mogul customer list after its Mogul acquisition, nor does the record establish the number of CPC Mogul customers who purchased non-Mogul binders from ICM or the amounts of their purchases. The record does not establish that ICM suffered any loss in regard to the Mogul customer list it purchased from CPC. Trademarks/Trade Names
As part of its acquisition of CPC's Mogul business, ICM obtained CPC's registered trademarks for Mogul and its trade name "Mogul." In the foundry industry, cereal binders are somewhat fungible, in that one binder can generally be used in place of another, although *355 different amounts might be necessary. As used in the foundry industry, however, there is fairly substantial product loyalty--to achieve relatively uniform results in the foundry molds requires consistency in the binder. [13] A good quality binder will be consistent, but this consistency is eliminated if different brands are used interchangeably. [14] Because of this, most foundries require fairly substantial product testing before they will approve a new binder for their own use. At the time of its Mogul acquisition, ICM regarded the Mogul name and trademark as being useful and advantageous but by no means of critical importance to the business. CPC's Mogul operation had a good reputation for product quality and service. During the period the Mogul name and trademark were not used, ICM sold all of the substitute product (SB-311) it could produce and could have sold much more at *356 that time if available. When ICM introduced its all extruded binder under the Mogul name in January 1976, following the completion of its specialty mill, its sales of the all extruded binder were not dramatically affected by its use of the Mogul name and may have been the same with or without use of the Mogul name. However, in the period after January 1976 and through 1978, the sales of SB-311 declined steadily whereas the sales of ICM's Mogul increased steadily. While in terms of numbers of customers, ICM may have lost many of the Mogul customers it had acquired from CPC, it continued to sell substantial amounts of Mogul to those former CPC customers and to sell its other products to those former CPC customers. After ICM resumed Mogul sales from its own production, the trade name was useful in reintroducing Mogul to some of the larger customers. Also because of the Mogul name, some of the foundries reduced or eliminated the strict testing they generally required of a new binder. Tax Treatment of Mogul Transaction
CPC accounted for this transaction as the sale of a business and reported the entire $240,000 for tax purposes as proceeds from the sale or exchange of a capital *357 asset. ICM accounted for this transaction as an expense which it labelled as "commission on a noncompetition agreement." ICM thus sought to deduct the entire $240,000 as an expense on its return for its fiscal year ending September 30, 1974. In his notice of deficiency, respondent disallowed the entire claimed deduction of $240,000. III. Section 38 Property and Useful Lives of Structures
A. Specialty Mill
One line of ICM's production is called the specialty products, which includes some food products and various cereal binders it manufactures for industrial use. All of these specialty products and binders are now manufactured in ICM's specialty mill. The two processes ICM now uses to produce these specialty products and binders are the "hot roll" process and the "Bonnot" process, described above. Before it completed the new specialty mill in January of 1976, ICM produced its specialty products in the old corn mill, using the "hot roll" process and the "Anderson" process, described above. After the new specialty mill was constructed, the machinery and equipment for the "hot roll" process were physically moved out of the old corn mill and installed in the new specialty *358 mill structure. The new machinery and equipment for the "Bonnot" process were acquired, installed in the new specialty mill, and placed into operation before that move occurred.The area in the corn mill where the "hot roll" process had previously been located was then used to expand ICM's corn mill operations after that move occurred. Once the "hot roll" process and the "Bonnot" process were in operation in the specialty mill, only specialty products were produced in that structure. As early as July 27, 1973, ICM had established as objectives the modernization and expansion of its corn mill and the development of a specialty mill modernization plan once a cost justification study had been made on the latter. Preliminary work had already been started on the corn mill modernization and expansion plan, but nothing had yet been done in regard to the specialty mill. ICM's acquisition of CPC's Mogul business in early 1974 necessitated the expansion of ICM's specialty products department and the removal of that department from the corn mill because its space in the corn mill was inadequate to meet ICM's expanded production needs and because ICM needed extra space at the corn mill to *359 complete its modernization and expansion plans there. Following ICM's Mogul acquisition in early 1974, Herman Kurrelmeier, ICM's manufacturing vice-president, in conjunction with Swarthout, designed the specialty mill. Kurrelmeier was trained as a mechanical engineer and had experience designing and building structures containing industrial processes. The sequence of design was first to decide upon the process, next to select equipment components (a key one here being the extruder), then to design a layout and arrangement of components which would combine them into a continuous flow unit, next to design the foundation and superstructure to support and hold everything together as a functioning unit, and finally to design a covering or skin to protect the equipment from the elements and to provide a sanitary environment for the production of food and other specialty products. A mechanical engineer would use basically the same approach to design any industrial operation, such as a corn mill or an assembly plant, although those types of operations might require additional design considerations depending upon the numbers and needs of workers and the equipment required for those industrial *360 processes. The specialty mill required a deeper foundation and footings than a general use structure, such as a warehouse or office building, of comparable size would have required. This was partly because of the weight of the machinery that would be placed in the mill. [15] Additionally, separate footings or pads were required for certain equipment to isolate the vibration that would occur when that equipment was in operation. The cost to ICM of the excavation and footings was approximately $150,000 to $160,000, while Kurrelmeier estimated the cost of excavation and footings for a general purpose structure of comparable size to be about $40,000. However, the record does not establish that the general foundation and footings for the specialty mill differed qualitatively or quantitatively from the foundation and footings of ICM's corn mill or any other factory containing heavy machinery and equipment. *361 In the specialty mill, there was a concrete floor slab for the first and second floors, and the third floor was made of open steel grating. Some of the pieces of equipment in the specialty mill extended through the floor from one level to another, which was also true of the corn mill. In the specialty mill there were myriad trenches, slots, and holes in the floors, in both the concrete ground floor and the upper floors, all precisely shaped and positioned to accommodate particular pieces of machinery or equipment and their functions. These included drain lines, electrical conduits, and pneumatic conveyor lines. Some of these holes housed equipment that traversed floors. If all the equipment were removed from the specialty mill, it would be possible to fill in all of these holes, slots, and trenches. The record does not establish that these holes, slots, and trenches differed qualitatively or quantitatively from those in ICM's corn mill or any other factory containing heavy machinery or equipment. The electrical distribution equipment that ICM installed in the specialty mill was almost entirely attributable to the equipment that ICM used in its specialty processes, rather *362 than for mere general purpose lighting and power receptacles. While the electrical equipment for the mill cost ICM approximately $178,000, the cost of electrical equipment for a general purpose building of comparable size would have been about $13,000. [16] Approximately 95 percent of the actual electrical load at the specialty mill is attributable to the machinery used in the specialty processes, rather than to general purpose lighting and power receptacles. The specialty mill was enclosed because of the necessity of protecting the equipment from the elements and providing a sanitary environment since some food grade products were produced there.The covering was a light metal skin, essentially a pre-engineered building, and was the cheapest obtainable type of covering. The outer shell or covering of the specialty mill was essentially the same as the outer shell or covering of Building 7, a warehouse building which adjoined the specialty mill structure. There was a *363 loading dock between Building 7 and the specialty mill structure that could service both structures. The specialty mill structure lacked a heating system except a few unit heaters to prevent the equipment from freezing during shut-downs. When in operation, the specialty mill equipment generated sufficient, if not excessive, heat to warm the building adequately. However, were the specialty mill equipment to be removed and the structure converted to another use, it might require the installation of heating equipment depending upon the type of equipment installed and type of use to which the structure might be put. In operation, the specialty mill is essentially a continuous and automatic operation involving little human labor. The feedstock for both the hot roll process and the Bonnot process are pneumatically blown or conveyed from the corn mill. For the Bonnot process, there is a bin that permits on-site storage of about a day's worth of feedstock. There is also a "surge" bin that permits on-site storage of about 20 to 30 minutes worth of feedstock; however, the primary purpose of the surge bin is not to store the feedstock but to regulate the flow of feedstock into the extruders. *364 There is no on-site storage for the hot roll feedstock but there is a storage area in the corn mill for this feedstock. There is no storage capacity at the specialty mill for the finished product of either the hot roll process or the Bonnot process. Instead, the finished products are pneumatically conveyed back to the corn mill for bagging and storage. The only workers in the specialty mill are the operator or "specialty miller" and his assistant, the oiler, on each shift. They monitor and maintain the proper functioning of the equipment. On the first shift there are also two clean-up people. There is a cubicle area located in the specialty mill where the specialty miller actually runs in-process quality checks on the product. There is also a small office for the manager of the specialty products department and toilet facilities. If mechanical difficulties develop with any of the machinery or equipment, maintenance personnel may also be on hand.
The design and construction of the structural "shell" or covering of the specialty mill are comparable to those of other structures at ICM's plant, for example, Building 7, a combination warehouse and research laboratory, and Building *365 8, a warehouse. Moreover, Building 7 is attached to the specialty mill. However, the internal layouts and functions of the equipment in these structures are quite different. Two 10 feet by 10 feet overhead doors were installed in the specialty mill. Although each component or piece of equipment of each of the processes is essential to producing the finished product, the layout of the equipment in the structure is such that any component or piece of equipment can be replaced. Moreover, all of the equipment can be removed without damaging the structure. In its operations in the manner and at the level as presently conducted, ICM would have no other use for the specialty mill structure if the existing equipment were removed, even if all the floor holes were filled. However, it would be possible to use the structure for storage or for the installation of other industrial processes if ICM should decide to expand or otherwise change its present operations. ICM placed the specialty mill into service during its fiscal year ending September 30, 1976. The total cost to ICM of the specialty mill was $1,843,644.46. On its return for its fiscal year ending September 30, 1976, ICM *366 claimed an investment tax credit for the entire cost of the specialty mill. In his notice of deficiency, respondent has determined that $1,295,056.46 of such cost was attributable to section 38 property and that the remaining $548,588 was attributable to building costs which do not qualify as section 38 property. Respondent thus disallowed the claimed credit in regard to this $548,588. On the same return, ICM also claimed that the specialty mill's depreciable useful life was the same as the machinery and equipment it housed, and computed its depreciation deduction accordingly. In his notice of deficiency, respondent determined that the specialty mill's depreciable useful life was independent of and longer than that of the machinery and equipment, and consequently he reduced ICM's allowable deduction for depreciation. B. Water Treatment Facility
ICM operated its former water treatment facility until it was forced to replace the facility due to the facility's failure to meet the Environmental Protection Agency (EPA) and local requirements. The old facility is approximately 27 feet by 27 feet square and is three stories high. The location of the old facility is out of the *367 mainstream of ICM's manufacturing plant, and ICM does not currently need the area occupied by that facility. In 1975, ICM put into operation a new water treatment facility.At that time, ICM simply abandoned in place the old system, equipment, and building. Because it produces foodstuffs, ICM fumigates the old water plant occasionally and does similar "house-keeping," to control rodents, birds, and insects.Since 1975, however, ICM has not used this plant for any of its operations. Kurrelmeier designed ICM's new water treatment facility for the sole function of treating waste water from the corn mill. As with the specialty mill, his design sequence was first to decide upon the process to be used, next to select the components of equipment needed, then to do a layout and arrangement so that the various components would function as a unit, next to design the foundation and superstructure to support and hold the components in their proper place so that the system would function as a unit, and finally to design a skin or covering for the assembled system. As with the specialty mill, the new water treatment facility required a substantial foundation and footings to support the equipment *368 to be located in the structure. There was substantial underground piping, and there were holes in the floor for equipment. The structure itself contained only one steel grating "floor" forming a partial mezzanine level to support certain equipment and allow access to it. The rest was basically open space. The major equipment contained in the facility consisted of two 10,000 gallon water tanks approximately 16 feet in diameter and 21 feet high, vacuum drums and pumps, filter rolls, and chlorinating equipment. A maze of piping interlaced these components. There is an electrical room in the new facility that contains electrical motor controls, starters, and switching gears. This room is approximately 10 feet by 7 feet. There is also a storage room in the new plant which is used to store chlorine and equipment. This room is approximately 10 feet by 6 feet. The new facility had to be enclosed because it was necessary to protect the equipment and the process within. The water treatment facility was enclosed by the cheapest possible roof and metal structure, essentially a pre-engineered building just like the enclosure for the specialty mill. The new water treatment facility *369 operates fairly automatically, except for the re-coating of the filter rolls which must be done every day. A water treatment operator works in the new plant during the first and second shift. The third shift runs unattended. The operator monitors the equipment, but his basic job is to prepare and apply the coating material on the filter rolls. This coating process cannot be automated and requires more than one eight-hour shift for coating all of the filter rolls. The new water treatment facility is located next to the power or boiler house, with these two structures sharing a party wall. The height of the new facility and the adjoining boiler house are the same. The structural "shell" of the new facility is essentially the same as that of the boiler house, as well as that of the specialty mill (Building 34) and two warehouses (Buildings 7 and 8). Again, however, the internal layouts and functions of the equipment in these structures are quite different. ICM's new water treatment facility is located at the north end of the new boiler plant whereas the milling operations are all south of the boiler plant. ICM chose the location of its new facility to take advantage of the *370 pre-existing gravity flow of the raw waste water from the corn mill to the old water treatment facility at the north end of ICM's property and to utilize that system. If the equipment were removed from the water facility, the remaining structure would have no useful function in petitioner's present milling or manufacturing operations.
It would be feasible to convert the new water treatment facility into an extension of the boiler house or into storage space. The new water treatment facility has an overhead door approximately 16 feet wide, and the equipment inside could be disassembled and removed without damage to the structure. It would be possible to convert the new facility into a storage facility, but ICM does not have any present need for such a storage facility. ICM placed its new water treatment facility into service during the fiscal year ending September 30, 1975. Its total cost was $353,375. On its return for the fiscal year ending September 30, 1975, ICM claimed an investment tax credit for the entire cost of the new facility. In his notice of deficiency respondent determined that $105,442 of ICM's costs represented "building" costs, which did not qualify as section *371 38 property. On its returns for the fiscal years ending September 30, 1975 and September 30, 1976, ICM also claimed that the depreciable useful life of the new water treatment facility was the same as the useful life of the machinery and equipment it housed, and computed its depreciation deduction accordingly. In his notice of deficiency, respondent determined that the new water treatment facility's depreciable useful life was independent of and longer than that of the machinery and equipment, and consequently he reduced ICM's allowable deduction for depreciation. [17]
C. Boiler House
ICM constructed a new boiler house and placed it into service during the fiscal year ending September 30, 1971. The structure was designed to accommodate two boilers, but only one was installed initially. The second boiler was not installed at the time of original construction because *372 ICM did not have enough money. The initial boiler was a large Babcock & Wilcox unit (hereinafter "B & W"), which is a model that must be built in place. The B & W unit required a special pad, involving steel reinforced concrete pier footings that extended five feet below ground level and one foot above floor level. This was separate from the structure's foundation. There was substantial underground piping, and there were sloping drainage trenches, 18 inches wide, and from 16 to 24 inches deep, around two sides of the boiler pad. The structure also contained water softening equipment required by the boiler. At the time it built the boiler house, ICM did not put in the foundation or pad for the second boiler because it had not yet selected a specific boiler. However, the structure was erected with an access door large enough so that ICM could move a boiler in without having to take down any of the structure. The access door is an overhead door 16 feet wide. ICM subsequently installed a second boiler in the boiler house structure. This second boiler was manufactured by Cleaver Brookes and is a model that is manufactured and assembled at the factory and then delivered to the *373 site, at which point it is then connected to water and steam lines, put on its foundation, and fired up. The Cleaver Brookes boiler could be removed in one piece without interference from the walls of the structure and that is the way the boiler was originally installed. The B & W boiler could not be removed from the boiler house in one piece. However, it could be dismantled and removed in pieces, the same way it was brought into the boiler house. The design and construction of the boiler house's structural shell are comparable to those of the new water treatment facility, (Building 3-D), the specialty mill (Building 34), and two warehouses (Buildings 7 and 8). However, the internal layouts and functions of the equipment inside these structures are quite different. The boiler house contains an office that is 10 feet by 18 feet and an electrical room that is 17 feet by 10 feet. The boilers themselves can operate automatically, but under its union agreement, ICM was required to have an operator in the power house on each shift to monitor the equipment. On its tax returns for the fiscal years ending September 30, 1972 through September 30, 1976, ICM claimed that the boiler *374 house's depreciable useful life was the same as the useful life of the machinery and equipment contained therein. Accordingly, it claimed depreciation deductions using this useful life. In his notice of deficiency, respondent determined that the boiler house's depreciable useful life was independent of and longer than the useful life of the machinery and equipment, and consequently, he disallowed part of ICM's claimed depreciation deductions for the years before the Court. IV. Useful Lives of Grain Storage Tanks
During the fiscal year ending September 30, 1976, ICM's wholly-owned subsidiary, ICM Grain Co. (ICM Grain), purchased the assets of Metcalf Grain, Inc., which was a country elevator located in the town of Metcalf, about 18 miles from Paris, Illinois. The purchase price of $450,000 was allocable in part to grain storage tanks, as follows: Corrugated steel tanks
$235,000
Concrete storage tanks
28,200
Bolted steel tanks
27,600
Also during the fiscal year ending September 30, 1976, ICM Grain constructed additional welded steel grain storage tanks on such premises at a cost of $430,318.38. Country elevator facilities such as the Metcalf facilities *375 owned by ICM Grain provide service to farmers by putting their goods into the marketable chain. This is the first step in the marketing of the grain once the farmers have harvested the crops from their fields. In general, the country elevator buys the grain from farmers. However, country elevators also store grain for farmers on a storage rental basis. The choice to store or to sell is the farmer's. Additionally, country elevators sometimes dry the corn, when necessary, to prevent spoilage. This storage and drying are basically comparable to what farmers can do on their own farms, to the extent of their available storage space. In fact, many farmers dry and store all of their own corn. The facilities for drying corn at Metcalf were not very modern, primarily using unheated air, and many farmers had better drying facilities than those at Metcalf. Since the purchase, ICM Grain has operated the Metcalf facilities as a typical country elevator. ICM Grain stood ready to receive the farmers' grain for either storage or purchase. Corn accounts for 60 percent to 75 percent of all grain handled at Metcalf and about 75 percent to 80 percent of the corn received there is ultimately *376 sold to ICM. Thus, between 45 percent and 60 percent of all grain handled at Metcalf is sold to ICM.ICM is able to get the best milling quality corn since it is able to make the highest bid for local corn due to savings on transportation costs. However, ICM would make the highest bid for the best milling quality local corn regardless of its ownership (through its subsidiary ICM Grain) of the Metcalf facilities. Since its incorporation, ICM Grain has purchased or leased elevators with a total storage capacity of approximately eight million bushels. All of these elevators are located within 35 miles of ICM's Paris facility. ICM's elevator business, conducted through ICM Grain, is very profitable, showing a higher return on ICM's investment than its milling operations. In 1980, ICM's elevator business showed as much net profit as did its milling business. Neither ICM nor ICM Grain owns or leases land upon which crops are grown. On its consolidated return for the fiscal year ending September 30, 1976, ICM claimed depreciation deductions upon the storage elevators at ICM Grain's Metcalf facility using the useful life provided in respondent's Asset Guideline Class "01.1" (agricultural *377 machinery and equipment). Respondent determined that the elevators were not within Asset Guideline Class "01.1," and in his notice of deficiency accordingly recomputed ICM's depreciation deduction using longer useful lives. OPINION I. LIFO Inventory - Warehouse Receipts
The question here is whether certain corn represented by warehouse receipts, which ICM purchased just before the end of its fiscal year and then resold by prior agreement to its supplier just after the fiscal year ended, was includable in its year-end LIFO inventory, so as to avert the adverse tax consequences of a "liquidation," "recapture," or "invasion" of ICM's LIFO inventory base. See footnote 4.
The parties have stipulated that ICM at no time intended to take delivery of the corn represented by the warehouse receipts from the Cargill and Andersons transactions and that ICM did not intend to use that particular corn in its milling operations. ICM contends that its legal ownership of the corn represented by the warehouse receipts, coupled with valid business reasons for its low year-end physical inventory of corn, warrants the inclusion of the corn represented by the warehouse receipts in its year-end *378 LIFO inventories. ICM also argues that it has engaged in these types of transactions before and that such transactions are in the nature of a hedge. Respondent argues that since ICM did not acquire the corn for the purpose of using it in its production, or for resale to its customers, the corn represented by the warehouse receipts is not properly includable in ICM's inventory.Respondent also contends that ICM's acquisition of the corn represented by the warehouse receipts is a mere paper transaction lacking economic substance entered into solely for tax benefit, and thus should be treated as a sham transaction. ICM uses inventories to account for the corn used in its milling operations, section 471, and it uses the LIFO method to compute its inventories. Section 472. Whether the corn represented by the Cargill and Andersons warehouse receipts is properly includable in ICM's ending LIFO inventory for 1973 and 1975 depends on the purpose for which ICM acquired and held that corn. Grant Oil Tool Co. v. United States,180 Ct. Cl. 633, 381 F. 2d 389, 398 (1967); Latimer-Looney Chevrolet, Inc. v. Commissioner,19 T.C. 120, 125 (1952). Section 1.471-1, Income Tax Regs. *379 , provides as follows: In order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor. The inventory should include all finished or partly finished goods and, in the case of raw materials and supplies, only those which have been acquired for sale or which will physically become a part of merchandise intended for sale…. (Emphasis added.) Thus, only property acquired for sale to customers in the ordinary course of business [18] or physicially incorporated into finished goods intended for sale to such customers is properly includable in inventory. United States v. Ingredient Technology Corp.,698 F. 2d 88 (2d Cir. 1983), cert. denied 462 U.S.     (1983); Francisco Sugar Co. v. Commissioner,47 F. 2d 555, 557 (2d Cir. 1931), revg. and remanding on another inventory issue 14 B.T.A. 1062 (1929); Pierce-Arrow Motor Car Co. v. United States,80 Ct. Cl. 488, 9 F. Supp. 577, 584-585 (1935); *380 Spiegel, May, Stern Co. v. United States,69 Ct. Cl. 110, 37 F. 2d 988, 990 (1930); J.E. Mergott Co. v. Commissioner,11 T.C. 47, 50 (1948), affd. 176 F. 2d 860 (3d Cir. 1949); E. Rauh & Sons Fertilizer Co. v. Commissioner,12 B.T.A. 468, 471 (1928); Burroughs Adding Machine Co. v. Commissioner,9 B.T.A. 938, 943 (1927). The recent Second Circuit case of United States v. Ingredient Technology Corp.,supra, is strikingly similar to the present one. [19] That case involved sugar acquired by a refiner with a prearranged resale back to its supplier after the close of the refiner's taxable year. The court held that the sugar was not includable in the taxpayer's LIFO inventory, stating, 698 F. 2d at 95: We conclude that the concept of inventory from an accounting point of view and the term inventory in the applicable Treasury Regulations would be meaningless were *381 there to be included in the term or concept property bought, agreed to be resold, never intended to be utilized in the trade or business of the taxpayer (except for tax purposes), and in fact under the corporate taxpayer's dominion, control, and at its risk about as long as the pea in the proverbial shell game is under the shell.
We agree with the Second Circuit. We are not persuaded by ICM's various arguments. ICM argues that there were valid business reasons for its low year-end physical corn inventories, reasons allegedly relating to the milling qualities of the particular year's "old" or "new" corn. The record is inadequate to establish these matters, but even assuming ICM had valid business reasons for its low physical inventories at times, that would not affect our decision. The crucial fact is that ICM did not intend to use the warehouse-receipt corn in its milling business. Mere legal ownership of the corn at the end of ICM's fiscal year, while necessary, is not sufficient to make it *382 an inventory item. United States v. Ingredient Technology Corp.,supra at 94; see also Corliss v. Bowers,281 U.S. 376, 378 (1930) (actual command over the property and not mere refinements of title is determinative for tax purposes). ICM's citation to Monfort of Colorado, Inc. v. United States,561 F. 2d 190 (10th Cir. 1977) is inapposite. The court held that the taxpayer there could use its commodity futures gains and losses as adjustments to its inventory valuation, since its commodity transactions were hedges in the nature of price insurance. Here, ICM's warehouse-receipts transactions were not hedges or price insurance in any form. Moreover, any gain or loss from a hedge transaction which is accounted for as an adjustment to ending inventory under Monfort of Colorado, Inc., would be limited to the net out-of-pocket gain or loss, here $1,368.16 for 1973 and $3,000 for 1975. ICM of course wishes to consider only half of the transaction, the alleged purchase, as an adjustment to its ending inventory. We also do not attach any significance to the testimony of Wiggins, ICM's president, that ICM had engaged in these *383 types of warehouse-receipt transactions in the past. Although consistency in inventory practices is important, sec. 1.471-2(b), Income Tax Regs., [20] such practices must still clearly reflect the taxpayer's income. Photo-Sonics, Inc. v. Commissioner,357 F. 2d 656, 658 n. 2 (9th Cir. 1966), affg. 42 T.C. 926, 935 (1964); S.C. Toof & Co. v. Commissioner,21 B.T.A. 916, 934 (1930). We find Wiggins' testimony inadequate to establish the nature of these earlier warehouse-receipts transactions, much less that this allegedly "consistent" inventory practice clearly reflected ICM's income. If the facts in the earlier years were the same as the facts in this case, we could not find that such warehouse-receipt transactions clearly reflected income. *384 Accordingly, we hold that the corn represented by the warehouse receipts from the Cargill and Andersons transactions was not properly includable in ICM's year-end LIFO inventories. [21]
II. ICM's "Mogul" Purchase
In February of 1974, ICM purchased CPC's Mogul cereal binder business. Each of the parties to the sale reported the transaction for tax purposes in the manner most favorable to it: CPC reported the transaction as a sale or exchange of a capital asset while ICM claimed a deduction for the entire purchase price as a "commission" for a covenant not to compete. CPC is not a party to this litigation. ICM concedes that the treatment on its tax return was incorrect, and now claims deductions for portions of the aggregate purchase price allocable among the various intangible assets acquired. ICM claims (1) *385 an amortization deduction for the portion allocable to the covenant not to compete; (2) an abandonment loss deduction under section 165 for the portion allocable to the technical data; and (3) a deduction for part or all of the portion allocable to the customer lists (a) as an ordinary and necessary expense under section 162, (b) as a loss under section 165, or (c) for depreciation under section 167. In support of his position that no deductions are allowable, respondent argues (1) that no allocation of the purchase price among the various assets is permissible and (2) that, in any event, ICM has failed to prove its entitlements to the deductions under the various sections claimed. We will address respondent's arguments in that order. A. Allocability of Purchase Price
CPC and ICM embodied their transaction in a Purchase Agreement. Paragraph 1 of that agreement provided that ICM was acquiring CPC's Mogul cereal binder business, including goodwill and "business assets." Paragraph 2 provided for a lump sum purchase price of $240,000, with no allocation of that amount among the assets. Paragraph 3 listed the specific "business assets" that ICM was acquiring. Paragraph 4 *386 listed CPC's affirmative covenants to ICM (customer notification and joint sales calls). Paragraph 5 provided CPC's negative covenant to ICM (covenant not to compete). Respondent argues that the Mogul business that ICM acquired is a "mass" or "indivisible" asset so that there can be no allocation of the lump sum purchase price among the various intangible assets acquired. We do not agree.
The sale of a going business may be viewed as a sale of separate business assets, not as a sale of a single indivisible entity. Williams v. McGowan,152 F. 2d 570, 572 (2d Cir. 1945). See also Watson v. Commissioner,345 U.S. 544, 551-552 (1953). Accordingly, a lump sum purchase price for a going business should, if possible, be allocated among the various assets acquired, including intangible assets, based on their respective values. Miller v. Commissioner,56 T.C. 636, 649 (1971). Depending on the facts of the case, an allocation may not always be possible. Generally, the "indivisible asset" theory, upon which respondent relies, has been applied *387 in cases where a taxpayer acquires a going concern with the primary value of the acquisition being goodwill or going-concern value. In such cases the courts have sometimes refused to sort out some small portion of the asset that may be a wasting asset for which a deduction (usually for depreciation) might otherwise be allowed. Manhattan Co. of Virginia, Inc. v. Commisioner,50 T.C. 78, 90 (1968).However, where the record contains sufficient data to permit an allocation between the nondepreciable portion and the depreciable portion of the asset acquired, the courts have made such allocations. Commissioner v. Seaboard Finance Co.,367 F. 2d 646 (9th Cir. 1966), affg. a Memorandum Opinion of this Court; Computing & Software, Inc. v. Commissioner,64 T.C. 223 (1975); Manhattan Co. of Virginia, Inc. v. Commissioner,supra at 90-91. Moreover, as this Court has pointed out, the indivisible asset theory "is designed to prevent a taxpayer from allocating to relatively insignificant depreciable assets the price actually paid *388 for nondepreciable intangibles. It is not intended to be used to deny an allocation of a part of the purchase price to the depreciable property where such property is a major factor in the transaction." Computing & Software, Inc. v. Commissioner,supra at 234. See also Commissioner v. Seaboard Finance Co.,supra at 652; Manhattan Co. of Virginia, Inc. v. Commissioner,supra at 90-91. Here ICM did not purchase just goodwill and going-concern value but purchased technical data, customer lists and a covenant not to compete. As discussed below, we have found that the covenant not to compete was a major factor in ICM's acquisition of CPC's Mogul business, that the covenant had substantial economic value, and that the covenant was not a nonseverable adjunct of the goodwill being transferred. Accordingly, we are satisfied that the indivisible or mass asset theory is inapplicable to this case. Computing & Software, Inc. v. Commissioner,supra.Furthermore, in cases discussing the indivisible asset rule, the usual context has been the question of depreciable versus nondepreciable assets. Here, the *389 intangible assets acquired may generate deductions other than depreciation, such as the amortization deduction for a covenant not to compete that ICM claims. We think that it is equally inappropriate to apply the indivisible asset rule to that situation, and that we should make an allocation here if one is otherwise appropriate. Respondent also argues that in any event no portion of the purchase price may be allocated to the covenant not to compete. He argues that the Purchase Agreement clearly allocates the $240,000 purchase price to only the "business assets" and goodwill and that "it is clear that the parties did not intend that any portion of the purchase price be allocable to the covenant not to compete." We disagree. Paragraph 1 of the Purchase Agreement states that CPC sells and ICM buys the "Mogul cereal binder business in the present States of the United States, including its good will and the business assets enumerated in Paragraph 3 below * * * for the consideration stated in Paragraph 2." We do not read this as meaning that the $240,000 was paid just for goodwill and the enumerated "business assets." Paragraph 2 does not allocate the purchase price in any way, let *390 alone indicate that the covenant not to compete is somehow subsumed in or just a nonseverable adjunct to the goodwill being transferred. On the contrary the covenant not to compete is discussed separately and in detail in Paragraph 5 of the Purchase Agreement. Citing Ullman v. Commissioner,264 F. 2d 305, 308 (2d Cir. 1959), affg. 29 T.C. 129 (1957) and Baldarelli v. Commissioner,61 T.C. 44, 49 (1973), respondent argues that under the "strong proof" rule ICM has not presented the "clear and convincing evidence" necessary to show "that the parties have an intent contrary to that expressed in the agreement." [22] Again, we disagree. As we read the Purchase Agreement, it makes no allocation of the $240,000 purchase price among the various assets. "[T]he 'strong proof' doctrine is inapplicable herein because none of the parties is attempting to vary to terms of the contract aswritten, but merely to construe the terms." Peterson Machine Tool, Inc. v. Commissioner,79 T.C. 72, 82 (1982) (emphasis supplied). Here, as in that case, the Purchase Agreement expressly provided for a covenant not to compete *391 but did not make any allocation of the purchase price for that or any other asset. Where the written agreement makes no allocation of the lump sum purchase price, we do not believe that a taxpayer trying to allocate a portion of such price to the noncompetition covenant is attempting to vary the terms of his written contract.Of course, this does not establish that ICM is entitled to allocate a specific portion of the purchase price to the covenant not to compete. There are other tests, discussed below, that ICM must satisfy to show how much, if any, of the purchase price may be allocated to the covenant. This, however, is a question of how much may be allocated to the covenant, and not the question of whether such an allocation may be made. Accordingly, this Court may allocate the lump sum purchase price among the various intangible assets that ICM purchased. *392 1. Covenant Not to Compete
To be entitled to amortize a covenant not to compete, a taxpayer must show: (1) that the covenant had independent economic significance such that we might conclude that it was a bargained-for element of the agreement; and (2) that the parties considered the covenant as a valuable part of the entire consideration for the agreement. See Peterson Machine Tool, Inc. v. Commissioner,supra,79 T.C. at 81, 83; Levinson v. Commissioner,45 T.C. 380, 389 (1966).
First it is clear that the covenant had significant independent economic value. Such a conclusion is apparent when we consider the position of ICM without such a covenant. While it is true that CPC had decided to abandon its cereal binder business, it made its decision based strictly on the profitability of that division. Absent the noncompetition covenant, there was nothing to prevent CPC from reentering the cereal binder market in the future if economic changes suggested increased profitability. Before its Mogul sale, CPC was a formidable competitor for ICM, *393 and, absent the covenant, could have again become an equally formidable competitor. After its Mogul sale, CPC still retained: (1) the basic starch biochemistry and technology to produce a cereal binder; (2) the production equipment; (3) its continued commercial relationship with customers in the foundry industry through its sale of resin coated sand for use in foundry cores; and (4) its economic resources as a large multinational corporation. Admittedly, CPC could no longer use the name "Mogul," because that trademark and trade name had been sold to ICM. However, ensuring that CPC would not compete against it in the cereal binder market had substantial economic substance and value to ICM. As to the second requirement, that the parties have considered the covenant as a valuable part of the total consideration, we think ICM meets the standard. Both Wiggins and Hassler testified that to ICM the covenant was one of the major assets acquired. Their testimony is buttressed by the substantial economic significance of the covenant. We think that CPC also considered the covenant to have value. Although the record of the negotiations is not as complete as we should like, it is undisputed *394 that by agreeing to the covenant, CPC limited its future business choices by promising not to produce and sell cereal binders or otherwise use the trade name Mogul. In light of the relative ease with which CPC could have reentered the cereal binder market absent the noncompetition covenant and the substantial economic substance and importance to the buyer of the covenant, we are satisfied that CPC also considered the covenant to be of value. Finally, we attach little significance to the fact that the parties apparently agreed upon a total purchase price at the outset before any agreement on the specific items to be included in the package, including the covenant not to compete, was negotiated. See Peterson Machine Tool, Inc. v. Commissioner,supra,79 T.C. at 83; Rudie v. Commissioner,49 T.C. 131, 139 (1967). ICM's tentative acceptance of the purchase price was a prerequisite to further negotiations, but hardly culminated the negotiations. The final written agreement contained a five-year covenant not to compete, set out in a separate paragraph of the document. There is nothing in the record to suggest that this specific time-limited *395 covenant was just a part of the general goodwill that was being transferred to ICM. Based on the entire record, we are satisfied that the covenant not to compete had substantial independent economic significance and that both parties considered it as a valuable part of the total consideration for the transaction. While the record is not as clear as we should like, we think it is appropriate to apply the principle of Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930), of course bearing heavily against the taxpayer whose inexactitude is of its own making. See Seaboard Finance Co. v. Commissioner,367 F. 2d 646, 652 (9th Cir. 1966), affg. a Memorandum Opinion of this Court; Peterson Machine Tool,Inc. v. Commissioner,supra,79 T.C. at 86; Computing & Software,Inc. v. Commissioner,supra,64 T.C. at 235. Under Cohan v. Commissioner,supra, we find that 20 percent of the total purchase price of $240,000, or $48,000, is properly allocable to the covenant not to compete and that amount may be amortized over the five-year term of the covenant.
2. Technical Data
*396 ICM claims an abandonment loss for the technical data which it values at $20,000.Pursuant to the purchase agreement, ICM acquired CPC's "specification sheet and manufacturing procedure for its 'MOGUL' brand cereal binder… and copies of current technical data relating to this product." We believe that this information, all subsumed for our purposes under the heading "Technical Data," was of value to ICM when it acquired CPC's Mogul business. As set forth in the Findings of Fact, ICM knew long before the acquisition that CPC was a "wet miller," a production method incompatible with ICM's, at least in regard to the feedstock used in the process. Swarthout, ICM's research director, had an indication of the production methods and feedstock used by CPC a week before the Purchase Agreement and the Manufacturing Agreement were consummated. On the other hand, because of CPC's use of dyes, its Mogul product looked like ICM's cereal binders, which suggested to Swarthout that there might be something similar in their production methods and technical data that would be useful to ICM. It was not until after the purchase when Swarthout actually visited the CPC plant that he learned that little *397 of the CPC process, at least as it pertained to the feedstock, could be directly used by ICM. Under Cohan v. Commissioner,supra, we find that 10 percent of the purchase price of $240,000, or $24,000, is properly allocable to the technical data. However, ICM is not entitled to an abandonment loss for this technical data. While we have found as a fact that ICM's method of producing Mogul was developed primarily through its own research, that alone does not establish an abandonment loss. To be entitled to such a loss, ICM must demonstrate an intention to abandon the technical data coupled with an act of abandonment, both of which must occur within the taxable year, and both of which must be shown by the facts presented. Coors Porcelain Co. v. Commissioner,52 T.C. 682 (1969), affd. 429 F. 2d 1 (10th Cir. 1970); Boston Elevated Railway Co. v. Commissioner,16 T.C. 1084, 1108-1109 (1951), affd. 196 F. 2d 923 (1st Cir. 1952). We do not believe that ICM's decision to produce its Mogul product through an all-extrusion process using moderate low temperature and low shear extruders either evidences *398 an intention to abandon the CPC technical data or constitutes an act of abandonment of that data. Indeed, in view of some similarities between CPC's moderate low temperature and low shear extruders and those later used by ICM, it is difficult to view such knowledge and information as having been abandoned. The fact that this knowledge may not have been directly used in ICM's Mogul manufacturing processes is not determinative. Often, learning what will not work is as useful as learning what will. By the same token, having one's own independent research and learning corroborated through the experience and learning of others is also valuable. We also believe that ICM can be said to have "used" CPC's technical data. While the specific production methods ICM used with its yellow goods feedstock represented primarily its own research and development, what ICM learned from CPC about basic starch biochemistry and cereal binder manufacturing processes corroborated its own research and indicated the method of production that ICM should employ. As such, it became part of ICM's capital cost of developing its "Bonnot" process for producing specialty products through a moderate low temperature *399 and low shear extruder but with its own dry-milled yellow goods feedstock. Hence, the technical data was neither "abandoned" nor otherwise "lost." [23] While ICM seeks to minimize the fact as merely a bit of sales puffery, we think it not insignificant that when ICM began to produce its own Mogul binder, it advertised to its customers as follows: Mogul was developed from over 50 years research. It is well known in the industry as a high quality product. Illinois Cereal Mills purchased the brand name and technical information necessary to produce Mogul. We are now manufacturing Mogul to the same high exacting standards. On this record we cannot find an abandonment or other loss of the technical data and information ICM purchased from CPC. 3.Goodwill and Going-Concern Value, Trademarks and Trade Names, and Customer *400 Lists
We believe that the remaining 70 percent of the $240,000 total purchase price or $168,000 is allocable to goodwill and any possible going-concern value, the trademarks and trade names, and customer lists. Because no tax consequences flow from this allocation, as we will discuss below, we need not and do not make any further suballocation of the purchase price among these various assets.
Essentially, goodwill is the expectancy of continued customer patronage without contractual compulsion and for whatever reason. Karan v. Commissioner,319 F. 2d 303, 306 (7th Cir. 1963); see also Commissioner v. Seaboard Finance Co.,supra,367 F. 2d at 649; Solitron Devices, Inc. v. Commissioner,80 T.C. 1, 17-19 (1983), and cases cited therein; Computing & Software, Inc. v. Commissioner,supra,64 T.C. at 232-233 and cases cited therein. Going-concern value, as distinguished from goodwill or perhaps as part of goodwill, is the enhanced value of the acquired assets deriving from "the ability of the acquired business *401 to generate sales without any interruption because of the takeover." Winn-Dixie Montgomery, Inc. v. United States,444 F. 2d 677, 685 n. 12 (5th Cir. 1971); Solitron Devices, Inc. v. Commissioner,supra,80 T.C. at 19-20. Neither goodwill nor going-concern value is subject to depreciation because the useful life is not susceptible of reasonable estimation. Computing & Software, Inc. v. Commissioner,64 T.C. at 232-233, and at 232 at n. 7. Consequently, there is no need to assign separate values to the goodwill and any possible going-concern value in this case. ICM concedes that it is not entitled to a deduction for the portion of the purchase price attributable to the trademarks and trade names. Trademarks and trade names are similarly nondepreciable because they have no ascertainable useful lives. Norwich Pharmacal Co. v. Commissioner,30 B.T.A. 326, 329 (1934). In fact, trademarks and trade names are generally viewed as a part of the goodwill. Clarke v. Haberle Brewing Co.,280 U.S. 384 (1930); *402 Renziehausen v. Lucas,280 U.S. 387 (1930); Norwich Pharmacal Co. v. Commissioner,supra.Accordingly, there is no need to determine what portion of the remaining purchase price is attributable to the value of the trademarks and trade names either as a part of goodwill or independently of goodwill. Finally, as to the customer lists there is no reason to suballocate any portion of the purchase price to them in this case.Customer lists are generally viewed as a single "indivisible asset" having an indefinite life, in the nature of goodwill or inherently inseparable from the purchased goodwill. Golden State Towel and Linen Service, Ltd. v. United States,179 Ct. Cl. 300, 373 F. 2d 938 (1967), and cases cited therein; Manhattan Co. of Virginia, Inc. v. Commissioner,supra,50 T.C. at 87.Of course in those few cases where customer lists have been found to have a reasonably determinable useful life separate from any goodwill or going-concern value, the courts have tried to allocate a portion of the purchase price to *403 such a depreciable asset. Manhattan Co. of Virginia, Inc. v. Commissioner,50 T.C. at 90-91. See also Commissioner v. Seaboard Finance Co.,supra, involving a similar situation with loan accounts. In this case, ICM has failed to provide any basis whatsoever for making any allocation between customer lists and goodwill and going-concern value or for establishing the useful life of the customer lists. ICM is not entitled to a deduction under any of the sections claimed. No deduction is allowable under section 162 because the customer lists have a useful life of over a year. Manhattan Co. of Virginia, Inc. v. Commissioner,supra,50 T.C. at 86; Boe v. Commissioner,35 T.C. 720, 725 (1961) and cases cited therein, affd. 307 F. 2d 339 (9th Cir. 1962). Furthermore, since the customer lists are viewed as a single indivisible asset, ICM is not entitled to a loss deduction under section 165; the law does not permit a deduction for a partial loss of a capital investment. Golden State Towel and Linen Service, Ltd. v. United States,supra;Anchor Cleaning Service, Inc. v. Commissioner,22 T.C. 1029, 1034-1035 (1954). *404 In addition, ICM has failed to prove that in fact a loss of any sort has occurred. ICM continues to sell Mogul and binders other than Mogul to a substantial number or significant percentage of the customers on the acquired CPC list. Moreover, ICM has not shown that any loss of business is permanent. Finally, no deduction is permitted for depreciation under section 167 because ICM has failed to prove the useful life of the customer lists. Section 1.167(a)-3, Income Tax Regs.; Rudie v. Commissioner,supra,49 T.C. at 137-138. To summarize, we have allocated the lump sum purchase price of $240,000 among the various assets as follows: Covenant not to compete
$48,000
Technical data
24,000
Trademarks, trade names,
customer lists, goodwill
and any possible going-concern
value
168,000
The $48,000 allocable to the covenant not to compete is amortizable over the covenant's five-year life. No amortization or other deduction is allowable for any other portion of the purchase price. III. Section 38 Property and Useful Lives of Structures
ICM claims an investment tax credit for the total costs of its *405 new specialty mill and new water treatment plant.ICM also claims that the depreciable useful lives of the new specialty mill, new water treatment plant, and the boiler house [24] are the same as those of the machinery or equipment housed within those structures. Respondent argues that these structures are "buildings," and thus the portions of the total construction costs attributable to these structures do not qualify for the investment tax credit. Moreover, respondent says that for depreciation purposes the useful lives of these structures are independent of and longer than the useful lives of the machinery or equipment they house. The issue for our decision is whether these three structures--the new specialty mill, the new water treatment facility, and the boiler house--are "buildings" so as to be excluded from the definition in section 48(a) of property eligible for the investment tax credit. [25]
*406 Buildings are not eligible for the investment tax credit. Section 48(a); sections 1.48-1(c), 1.48-1(d)(1), Income Tax Regs.[26] In determining whether a structure is a "building" and hence not section 38 property, the term "building" is given its commonly accepted meaning. Samis v. Commissioner,76 T.C. 609, 617 (1981); Consolidated Freightways, Inc. v. Commissioner,74 T.C. 768, 793 (1980), affd. on this point, 708 F. 2d 1385 (9th Cir. 1983). *407 Section 1.48-1(e)(1), Income Tax Regs., generally defines a building as follows: The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. * * * However, the regulation then excludes from the definition of buildings certain structures that may look like buildings but do not function as buildings and therefore may qualify as section 38 property. Section 1.48-1(e)(1), Income Tax Regs., excludes from the term "building"-- (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity *408 specified in section 48(a)(1)(B)(i) [such as manufacturing or production] if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractioning towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples. Thus, the pertinent regulations define "building" in terms of both appearance and function. Although there may be some disagreement or at least a different approach among the courts as to how much weight is to be accorded to the "appearance test," no court has wholly disregarded the appearance test; however, most of the courts generally regard the "functional test" as the more important of the two. Compare *409 Consolidated Freightways, Inc. v. Commissioner,supra; Consolidated Freightways, Inc. v. United States,620 F. 2d 862 (Ct. Cl., 1980); and Thirup v. Commissioner,508 F. 2d 915 (9th Cir. 1974), revg. 59 T.C. 122 (1972) with A.C. Monk & Co. v. United States,686 F. 2d 1058 (4th Cir. 1982) and Yellow Freight System, Inc. v. United States,538 F. 2d 790 (8th Cir. 1976). The appearance test does not help ICM in this case. Here, the three structures clearly looked like buildings, and we do not understand the taxpayer to suggest otherwise. However, we have not found any case in this or any other court that holds that appearance alone is determinative, so we must also consider the second test as to whether or not the structures functioned as buildings. The functional test is defined by this Court as follows: The functional test inquires whether "the purpose" of the structure at issue is a purpose ejusdem generis to the purposes described by example in the regulations, i.e., "to provide shelter *410 or housing, or to provide working, office, parking, display, or sales space." Sec. 1.48-1(e)(1), Income Tax Regs. The regulations ask whether the [structures] perform a function similar to "apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores." Sec. 1.48-1(e)(1), Income Tax Regs.
Consolidated Freightways, Inc. v. Commissioner,supra,74 T.C. at 795. See also Thirup v. Commissioner,supra,508 F. 2d at 919. In applying the functional test, an important but not determinative factor has been the human activity within the structure. Consolidated Freightways, Inc. v. Commissioner,708 F. 2d 1385 (9th Cir. 1983), affg. on this issue 74 T.C. 768 (1980); Thirup v. Commissioner,supra;Valmont Industries, Inc. v. Commissioner,73 T.C. 1059 (1980). The definition in section 1.48-1(e)(1), Income Tax Regs., expressly includes as "buildings" *411 factory and office buildings where human activity may normally be expected to be of great importance; it also expressly includes as "buildings" warehouses, barns, and structures providing parking spaces, where human activity may be of little or no importance. The courts have considered the matter of human activity, sometimes in terms of the nature of the human activity and sometimes in terms of the quantity and quality of human activity in the structure. Thirup v. Commissioner,supra,508 F. 2d at 919; Consolidated Freightways, Inc. v. Commissioner,74 T.C. at 795-796; Consolidated Freightways, Inc. v. United States,supra,620 F. 2d at 872-873. For example, even when there is substantial human activity within the structure (greenhouse), the structure may not be a building if the structure itself functions as something other than a building. Thirup v. Commissioner,supra.Thus, the inquiry as to human activity has been directed toward whether the human activity was "more than merely incidental to the primary function of that structure." Valmont Industries, Inc. v. Commissioner,73 T.C. 1059, 1072 (1980). *412 See also Consolidated Freightways, Inc. v. United States,708 F. 2d 1385 (9th Cir. 1983), affg. on this issue 74 T.C. 768 (1980); Consolidated Freightways, Inc. v. United States,supra,620 F. 2d at 872-873.
Thus, we must consider what function the structure itself serves. This has been the ultimate inquiry that the courts have made in those cases where structures that may otherwise look like buildings have been found not to be buildings for purposes of the investment tax credit. See, for example, Thirup v. Commissioner,supra, where the greenhouses were essentially equipment or part of the manufacturing or production process of growing the plants; Brown-Forman Distillers Corp. v. United States,499 F. 2d 1263 (Ct. Cl. 1974), where the whiskey maturation structures served essentially as an "oven" to age the whiskey; Satrum v. Commissioner,62 T.C. 413 (1974), where the specially designed walls, roof, and floors of the "henhouse" served as an integral part of the egg-producing facility; Central Citrus Co. v. Commissioner,58 T.C. 365 (1972), where the *413 "sweet room" served to ripen and condition the fruit; Catron v. Commissioner,50 T.C. 306 (1968), where the facility functioned to provide cold storage for the apples; Brown & Williamson Tobacco Corp. v. United States,369 F. Supp. 1283 (W.D. Ky. 1973), affd. per curiam 491 F. 2d 1258 (6th Cir. 1974), where the tobacco sheds functioned to store and age the tobacco.
This aspect of the functional test is sometimes articulated as whether the structures are "specialized structures whose utility is principally and primarily a significantly contributive factor in the actual manufacturing or production of the product itself." Thirup v. Commissioner,supra,508 F. 2d at 919. However, it is also recognized that many "specialized structures" may still be buildings. Consolidated Freightways, Inc. v. Commissioner,supra,708 F. 2d at 1389. It is these legal principles and guidelines that we must apply to the structures in this case to determine whether or not they function as buildings or as something other than buildings. Our first inquiry will be directed to the matter of human activity since that *414 has been an important factor in many of the decided cases. Here, the industrial processes conducted in the three structures are highly mechanized or automated processes, and few workers are needed to operate them. In the specialty mill one operator or "specialty miller" and his assistant, an "oiler," work on each shift. They monitor and maintain the proper functioning of the machinery and equipment. On the first shift, there are also two clean-up people, and maintenance personnel are on hand whenever mechanical difficulties develop with any of the machinery or equipment. There is a cubicle located in the specialty mill where the specialty miller runs in-process quality checks on the specialty items being produced. There is also a small office for the manager of the specialty products department and toilet facilities for the employees. The quantity of human activity is also limited in the other two structures. The water treatment facility operates fairly automatically except for the re-coating of the filter rolls which must be done every day. A water treatment operator works in the plant the first and second shifts, but the third shift runs unattended. That operator monitors *415 the equipment but his basic job is to prepare and apply the coating material on the filter rolls, a process that cannot be automated and that requires more than one eight-hour shift to coat all of the filter rolls. The boilers in the boiler house can operate automatically but under its union agreement ICM has to have an operator in the boiler house on each shift to monitor the equipment. Factories are expressly included in the regulations as an example of structures that are "buildings." However, whether a totally-automated factory with robots and no human workers would still be a building within the terms of the regulations and case law has never been decided and is not presented in this case. And, if a head-count of employees was the sole determinant of whether or not a structure functions as a building, our inquiry might end at this point. However, where, as here, the industrial processes carried on within a structure otherwise appearing to be a factory building are highly automated, requiring few workers, we think whether the structure functions as a factory building requires further scrutiny. We must examine (1) whether the structure itself is a part of that industrial process *416 and (2) whether the structure is so closely tied to that process that it clearly will be replaced when the machinery or equipment is replaced.
This inquiry as to the function of the structure itself is mandated by section 1.48-1(e)(1), Income Tax Regs. As we have already noted above, the regulations exclude from the definition of a building certain structures that may otherwise look like buildings but do not function as buildings. The first exception is a structure "which is essentially an item of machinery or equipment." Section 1.48-1(e)(1)(i), Income Tax Regs. The second exception is a structure "which houses property used as an integral part of [manufacturing, production, or other qualifying uses] if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced." Section 1.48-1(e)(1)(ii), Income Tax Regs. If the structures come within either of these exceptions, they are not to be considered *417 as factory buildings despite their appearance as factory buildings. ICM describes its specialty mill as being in reality "nothing but a very large complex machine with raw material (corn meal or corn grits) flowing in at one end of the mill and then moving continuously through the system until it flows out of the other end and back to the corn mill for shipment as finished product." That is an accurate description of the hot rolls, conveyers, extruders and other pieces of machinery or equipment making up the hot roll process and the Bonnot process in the specialty mill. That, however, is not an accurate description of the specialty mill structure itself and respondent has already allowed the investment tax credit in regard to this machinery or equipment. [27] The three structures in this case are essentially pre-engineered buildings that shelter or house the machinery or equipment contained within. Thus, to the extent that ICM is relying upon the first exclusion in section 1.48-1(e)(1)(i), Income Tax Regs., a structure that is "essentially an item of machinery or equipment," its reliance is misplaced. The three structures do not themselves function as *418 machinery or equipment. ICM also argues that its specialty mill, water treatment plant, and boiler house amount to just structural shells to provide the cheapest possible covering for the machinery or equipment within. ICM is relying on the exception under section 1.48-1(e)(1)(ii), Income Tax Regs., which, as the Court has noted, applies to those structures that are little more than a skin covering or shell for the machinery or equipment housed within. Samis v. Commissioner,supra,76 T.C. at 618; Valmont Industries, Inc. v. Commissioner,supra,73 T.C. at 1075. Specifically, that regulation excludes a structure "which houses property used as an integral part of * * * [manufacturing, production, or other qualifying activities]." There is no question that the structures here do shelter or house such property. The next *419 issue is whether or not there is the requisite close nexus between the structures and the machinery or equipment so as to meet the further requirement of the regulation that "the use of the structure [the pre-engineered building] is so closely related to that use of such property [the machinery or equipment] that the structure clearly can be expected to be replaced when the property it initially houses is replaced." A.C. Monk & Co. v. United States,supra,686 F. 2d at 1062. We cannot find that the structures in this case are so closely tied to the machinery or equipment. The machinery or equipment for the "hot roll" process had previously been located in ICM's corn mill but the space in the corn will was needed for expansion of the corn mill operations. That machinery or equipment was then moved into the specialty mill structure. Having been once moved from one location to another, the machinery or equipment could again be moved if the need arose. We fail to see how it could be said that the pre-engineered building in which the hot roll process was relocated would necessarily have to be replaced when the machinery or equipment it "initially houses" *420 is replaced. The area of the corn mill where the hot roll process was "initially" housed was not replaced when the machinery or equipment was moved into the new structure. We also cannot find any close tie between the structural shell and the machinery or equipment for the Bonnot process. Likewise, there is no close tie between machinery or equipment and the structural shell or pre-engineered building covering the new water treatment plant and the boiler house.In the boiler house, only one boiler was initially installed; space was left for another boiler to be selected and installed later. The two boilers now in the power building could be removed and replaced by other boilers, and we cannot find that the useful life of the structural shell is necessarily the same as that of the boilers.The machinery or equipment from the water treatment facility could also be removed without damage to the structural shell although the removal would leave essentially an open space in that building. The machinery or equipment can be removed from all three structures without damage to the structures, and other machinery or equipment for the same or different industrial processes can be installed *421 in those structures. Generally, we cannot find the requisite nexus between the structures and the machinery or equipment within that the regulations call for, but we will address the specific factors in the regulations to see if that inquiry produces a different result. The regulations list two specific factors to be included in deciding whether or not there exists the requisite close relationship between the structure and the machinery or equipment contained within the structure: (1) that the structure is specifically designed to provide for the stress and other demands of the machinery or equipment, and (2) that the structure cannot be economically used for other purposes. See Samis v. Commissioner,supra,76 T.C. at 617, sec. 1.48-1(e)(1)(ii), Income Tax Regs.
We have recognized that all industrial structures or manufacturing facilities are specially designed to some extent. Valmont Industries, Inc. v. Commissioner,supra,73 T.C. at 1078. Here, there was no special design of these pre-engineered buildings, *422 at least as to the walls and roofs. The water treatment plant was located next to the power building or boiler house and shared a party wall with it. The structural shells of the specialty mill, water treatment plant, and boiler house were the same as the structural shells of Buildings 7 and 8, which were warehouses. ICM argues that the foundations and interiors of the three structures were different from those for general purpose structures such as warehouses or office buildings. That is correct in the sense that the interiors contained heavy machinery or equipment. However, the record does not establish that the foundations for the structural shells were qualitatively or quantitatively different from the foundations of the corn mill or any other factory building. We cannot find that the structural shells and their foundations as such were specially designed. It does appear, however, that the foundations for some of the machinery or equipment were specially designed for them. The record does not show exactly what costs of the total costs of the specialty mill and water treatment plant respondent disallowed as building costs. To the extent that specific pieces of machinery *423 or equipment required special foundations, pads, or footings, we think those costs would be part of the costs of the machinery or equipment and not building costs in any event. [28]
The next factor for our consideration is whether or not the structures could be economically used for other purposes. Although sometimes discussed in terms of adaptability to other uses, this factor is another aspect of the functional test that we are applying to the structures in this case. Consolidated Freight-ways, Inc. v. Commissioner,708 F. 2d 1385 (9th Cir. 1983), affg. on this issue, 74 T.C. 768 (1980); A.C. Monk & Co. v. United States,supra,686 F. 2d at 1061; Brown-Forman Distillers Corp. v. United States,supra,499 F. 2d at 1271. *424 The taxpayer has the burden of showing that the structures have no reasonable or practical alternate use except to house the specific machinery or equipment they now house. A.C. Monk & Co. v. United States,supra,686 F. 2d at 1062. We think ICM did not carry its burden. ICM's officers and employees testified in conclusory terms that there would be no other use to which they could put the structures if they ceased using the specialty mill, water treatment plant, and boiler house for their present purposes. As ICM's operations are currently conducted, there may well be no other present alternative use that they contemplate. The factor of adaptability to other uses postulates that there is going to be a change from present operations.We think we must apply an objective standard in determining whether the structures can be economically used for other purposes or are generally adaptable to other uses, rather than restricting our inquiry to the present business needs and subjective intentions of ICM. All of the machinery and equipment in the three structures *425 can physically be removed from the structures without damage to the structures. The specialty mill structure is essentially like Building 7 and there is a loading dock between he two which can service both.We think the specialty mill structure could be used as a warehouse as Building 7 is now used. Also just as the hot roll process was removed from the corn mill and the corn mill operations expanded into its space, we can perceive no reason why the hot roll process and/or the Bonnot process could not be removed from the specialty mill, and the specialty mill structure used for further expansion of ICM's corn milling operations or for other industrial processes in the future.As for the water treatment facility, which is next to and shares a party wall with the boiler house, we think it could be used for either storage or for expansion of the boiler house. Also the boilers can be removed from the boiler house and new replacement boilers installed therein or the space used for storage or other industrial processes. There is no persuasive evidence that such alternate uses would not be possible and practical from an economic point of view. We have reviewed and considered all of the *426 facts and circumstances in regard to these structures--the fact that they look like buildings, the fact that they serve as highly-automated factories sheltering or housing industrial processes and the few workers necessary to operate and monitor those processes, the fact that the structures do not themselves function as items of machinery or equipment, the fact that the structures would not clearly be expected to be replaced when the items of machinery or equipment initially housed within them are replaced, and the fact that these structures could be economically used for other purposes.For all of these reasons, we conclude that the structures here function as buildings. Thus, under both the appearance test and the functional test, we conclude that the structures are buildings and do not qualify as section 38 property. We also sustain respondent's determination that the useful lives of the structures are independent of and longer than the useful lives of the machinery or equipment. Citing our opinion in Scott Paper Co. v. Commissioner,74 T.C. 137 (1980), ICM argues alternatively that certain portions of the construction costs of the specialty mill that respondent *427 disallowed as "building costs" are nonetheless allowable because those costs relate to the machinery or equipment and not to the building. We agree. We have already discussed the machinery foundations, pads and footings above and the lack of any factual basis in that regard. See footnote 28. However, there is no such failure of proof in regard to the electrical equipment. We have found as a fact that 95 percent of the electrical usage was for operation of the machinery and equipment and only five percent for the general operation or maintenance of the building. We have already approved in Scott Paper Co. such an allocation based on the percentage of usage allocable to the machinery and equipment. 74 T.C. at 185-187. We will follow that precedent in this case. [29]
*428 IV. Useful Lives of Grain Storage Tanks
The narrow issue for decision here is the depreciable useful lives of the grain storage tanks owned by ICM's subsidiary, ICM Grain Co., at its Metcalf facility. Specifically, the issue is whether those tanks fall within respondent's Asset Guideline Class "01.1." See footnote 3. ICM contends that the grain storage tanks are within Asset Guideline Class "01.1;" respondent contends that they are not. Rev. Proc. 72-10, 1972-1 C.B. 721, 723, delineates Guideline Class 01.1 as follows: 01.0 Agriculture: Includes only such assets as are identified below and that are used in the production of crops or plants, vines and trees (including forestry); the keeping, grazing, or feeding of livestock for animal products (including serums), for animals increase, or value increase; the operation of dry lot or farm dairies, nurseries, greenhouses, sod farms, mushroom cellars, cranberry bogs, apiaries, nd fur farms; the production of bulb, flower, and vegetable seed crops; and the performance of agricultural, animal husbandry and horticultural *429 services. 01.1 Machinery and equipment, including grain bins and fences but no other land improvements…. [30]
Section 1.167(a)-11(b)(4)(iii)(b), Income Tax Regs., provides as follows: For purposes of this section, property shall be included in the asset guideline class for the activity in which the property is primarily used. * * * Property shall be classified according to primary use even though the activity in which such property is primarily used is insubstantial in relation to all the taxpayer's activities. In TennesseeNatural Gas Lines, Inc. v. Commissioner,71 T.C. 74, 94 (1978), we pointed out that "this regulation does not refer to the nature of the equipment or the manner in which it operates; rather, this regulation emphasizes the use to which the equipment is put." (Emphasis in original.) Specifically, the regulation focuses upon "the activity in which the property is primarily used" in isolation from the rest of the taxpayer's activities. *430 As we detailed in the findings of fact, ICM Grain operates the Metcalf facility in the same manner it was operated before ICM acquired it. This country elevator facility provides basic storage and drying of the grain and places an individual farmer's grain into the stream of commerce. In storing the corn, the country elevators such as the Metcalf facility use essentially the same equipment and perform essentially the same service as a farmer would do for himself to the extent he had on-farm storage capacity. Thus, we believe that ICM Grain's country elevator facilities may fairly be characterized as used either "in the production of crops" or "the performance of agricultural… services." We do not find significant respondent's purported distinction between farmers who store their own corn or lease storage, and farmers who sell their corn. We believe that the grain storage tanks in either case are used "in the production of crops" and "the performance of agricultural… services." We doubt that respondent would challenge that fact if this country grain elevator were owned and operated by someone other than ICM or ICM's subsidiary. The problem as respondent sees it seems to *431 be that ICM Grain is ICM's wholly-owned subsidiary and that ICM bought substantial amounts of corn from that elevator. Thus respondent argues that these grain sotrage tanks were primarily used as storage for ICM's raw materials for its manufacturing processes. We do not view the facts that way. Respondent seems to argue that ICM Grain's Metcalf country elevator operation should be integrated back into ICM's entire operation on the ground that between 45 and 60 percent of the grain stored at Metcalf is sold to ICM. Respondent concludes that the grain storage tanks are not "used in the production of crops, or the performance of agricultural… services," but rather are used in ICM's corn milling operations. We do not agree. ICM Grain operates the Metcalf facility in the same manner it was operated before it was acquired by ICM. While it is true that ICM purchases a large amount of the grain stored at its subsidiary's Metcalf facility, it would do so regardless of who owned and operated the facility. The grain storage business, conducted through its subsidiary ICM Grain, has become a very profitable business activity in its own right, but at most that business is merely complementary *432 to ICM's corn milling and manufacturing operation. Moreover, even if we ignore the fact that two separate corporations are involved, respondent's attempt to integrate the grain storage business back into ICM's milling and manufacturing operation violates his own regulation. That regulation directs us to examine the primary use of the property in question in isolation from ICM's overall activities. See section 1.167(a)-11(b)(4)(iii)(b), quoted and discussed above. Accordingly, we hold that the grain storage tanks at ICM Grain's Metcalf facility are properly classified under respondent's Asset Guideline Class 01.1, and thus the useful life of such storage tanks is 10 years, as stipulated. To reflect the parties' stipulations and the above holdings, Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all references to Rules are to the Tax Court Rules of Practice and Procedure. ↩
2. The parties have agreed that if the structures are notsection 38 property, the useful life of each is 25 years; they have also agreed that the useful life of the machinery and equipment in each structure is 13.5 years. The parties have not stipulated that if the structures are section 38↩ property, their useful lives are necessarily the same as the useful lives of the machinery and equipment contained therein; however, the parties seem to have tried and briefed the matter as if that were the situation. 3. The parties have agreed upon the useful lives that will result from this determination.↩
4. Under the LIFO method of accounting, the most recently acquired inventory is deemed to have been moved into production, and the oldest inventory accumulates in the inventory balances. Thus, these year-end inventory balances are valued at their historic acquisition costs, which, over a period of time and in an inflationary economy, tend to be much less than current inventory replacement costs. When the LIFO inventory balance at the close of the year is less than the balance at the beginning of the year, part of the inventory represented by the beginning year balance becomes a part of the cost-of-goods-sold deduction for that year. Since this LIFO inventory deemed a part of current production costs is, by current standards, grossly undervalued, a LIFO method taxpayer's cost-of-goods-sold deduction is less and his adjusted gross income more than if the LIFO inventory balances had not decreased. This "transfer" of low value LIFO inventory to cost of goods sold caused when year-end inventory balances are less than beginning balances is called a "liquidation" or "recapture" or "invasion" of the taxpayer's LIFO inventory base. ↩
5. In his notice of deficiency in docket No. 1619-76, respondent also determined that certain corn-in-transit was not includable in ICM's LIFO inventory for the fiscal years ending September 30, 1973 and September 30, 1974.His adjustment was based in part on that determination. Respondent has now conceded that ICM properly included this corn-in-transit in its inventory, and this concession will be reflected in the parties' Rule 155 computations.↩
6. The tax consequences to ICM of the Manufacturing Agreement are not at issue in this proceeding, but certain aspects of it affect some of the issues remaining for our determination.↩
7. Wiggins intimated at the trial that the failure to make an allocation was because CPC was just interested in selling its assets and ICM was just interested in obtaining the covenant not to compete. That suggestion is not borne out by any of the contemporaneous documents or by the testimony of any of the other participants in the negotiations, and we reject it.We agree that the covenant not to compete was important to ICM, but we do not think that it was the only item of value purchased by ICM.↩
8. No. 5 or No. 6 grits referred to the size of the remaining split endosperm portion. The number referred to the number of holes per inch in a mesh grid through which the particular endosperm portion would pass. No. 5 grits were the endosperm portion that would pass through a grid mesh with holes 5 by 5 (25) per square inch; No. 6 grits meant that the mesh was 6 by 6 (36) per square inch.↩
9. CPC had stopped producing Mogul for ICM in late June of 1974 because of a strike at its Argo plant. During this interim, ICM had marketed a substitute binder, known as SB-311, in order to attempt to supply the former CPC customers. ICM did not use the Mogul name for its own product until it went into production in January of 1976.↩
10. Hundredweight (units of 100 pounts).↩
11. Sales of Mogul by CPC in its last full calendar year. ↩
12. In fiscal 1974, CPC shipped Mogul to ICM's Mogul customers from February through September 30, 1974, and the figures for 1974 represent this eight month period only. The figures are not entirely representative because they omit CPC's Mogul sales during 1974 before the sale to ICM and represent only the shipments of material on hand after the strike at the Argo plant halted CPC's production of Mogul. However, all of the 132,043 cwt. shipped in 1974 was CPC-produced Mogul. If any of ICM's SB-311 was sold in 1974, those figures are not in the record. However, since 7,813 cwt. of the total 125,766 cwt. shipped to former CPC Mogul customers in FYE 9-30-75 was CPC-produced Mogul (125,766 total less 117,953 cwt. SB-311), this suggests that the SB-311 did not become available until ICM's fiscal year 1975. This also suggests that any decline in the number of CPC's former Mogul customers in fiscal year 1974 can be accounted for by the decreasing profitability of that line of business, which was CPC's reason for selling the Mogul business in the first place, rather than by reason of the strike at the Argo plant and any resulting shortages.↩
13. In this context, consistency means that the same amount of binder mixed with the same amounts of other ingredients will have the same end result each time. ↩
14. A different brand binder will require a different amount when mixed with the other ingredients to generate the desired end result.↩
15. Part of the additional depth of the foundation was required by the marshy conditions of the land on which the specialty mill was built. Unless built on bedrock, a structure like the specialty mill or any factory involving heavy machinery and equipment would usually require a deeper foundation than would a general use structure of comparable size, no matter what the soil conditions were.↩
16. In his notice of deficiency, respondent allocated the total cost of $178,013 for electrical equipment to section 38 property in an amount of $97,907 and to non-section-38↩ property in an amount of $80,106.
17. On its return for fiscal year ended September 30, 1975, ICM also claimed a loss from the abandonment of its old water treatment facility. Respondent in his statutory notice disallowed this loss. Respondent now concedes that this loss is allowable in the amount of $18,959, as claimed on the return.↩
18. ICM does not argue, nor would the record support a finding, that ICM was in the business of buying and reselling raw corn during the fiscal years ending September 30, 1973 and September 30, 1975.↩
19. That case was a criminal prosecution for tax evasion, and this case does not involve any suggestion of fraud; however, the substantive tax issue is the same in both cases.↩
20. Section 1.471-2(b), Income Tax Regs., provides: [I]nventory rules cannot be uniform but must give effect to trade customs which come within the scope of the best accounting practice in the particular trade or business. In order to clearly reflect income, the inventory practice of a taxpayer should be consistent from year to year, and greater weight is to be given to consistency than to any particular method of inventorying or basis of valuation so long as the method or basis used is in accord with §§ 1.471-1 through 1.471-11↩.
21. In light of our decision we do not address respondent's argument that the transaction constituted a mere sham. But see United States v. Ingredient Technology Corp.,698 F. 2d 88, 94 (2d Cir. 1983), cert. denied     U.S.     (1983); Gilbert v. Commissioner,248 F. 2d 399, 412↩ (2d Cir. 1957) (L. Hand, J., dissenting).
22. Respondent also urges us to apply the "Danielson" rule (see Commissioner v. Danielson,378 F. 2d 771, 775 (3d Cir. 1967) vacating and remanding 44 T.C. 549 (1965)) and hold ICM to the express terms of its agreements absent evidence sufficient in a suit at common law to alter or revoke the agreement (fraud, misrepresentation, etc.). In light of our construction of the Purchase Agreement, we need apply neither the "strong proof" rule nor the "Danielson" rule. However, in those cases where one of the parties is attempting to vary the terms of his agreement, the position of this Court is clear. We will apply the "Danielson" rule in cases appealable to the Third Circuit under our rule of Golsen v. Commissioner,54 T.C. 742, 756-758 (1970), affd. 445 F. 2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). However, where the Circuit Court of Appeals to which an appeal will lie has not ruled on the "Danielson" issue, we will continue to apply the strong proof rule, which we consider to be the correct rule of law. See Major v. Commissioner,76 T.C. 239, 248-249 (1981); GC Services Corp. v. Commissioner,73 T.C. 406, 412 n. 2 (1979); Baldarelli v. Commissioner,61 T.C. 44, 49-50 (1973); Lucas v. Commisioner,58 T.C. 1022, 1032 n. 1 (1972); Mittleman v. Commissioner,56 T.C. 171, 175 (1971), affd. per curiam 464 F. 2d 1393 (3d Cir. 1972); Schnitz v. Commissioner,51 T.C. 306, 315-318 (1968), affd. sub nom. Throndson v. Commissioner,457 F.2d 1022↩ (9th Cir. 1972).
23. Nor can ICM claim deductions under other sections--the technical data clearly has a useful life of over a year, so expensing under section 162 is improper, and ICM has failed to prove a depreciable useful life for the technical data, so no depreciation deduction is allowable. Section 1.167(a)-3, Income Tax Regs.↩
24. The boiler house, sometimes referred to as the "power building," was placed into service prior to the years before the Court and no investment tax credit can be claimed for that structure. However, whether or not the structure is a "building" is in dispute because of the useful life issue.As in the case of the other structures, ICM argues that the boiler house is not a building and that its useful life is the same as that of the machinery or equipment contained within it. ↩
25. These structures are property with respect to which depreciation is allowable and which have useful lives of three years or more, section 48(a)↩, thus leaving the narrow issue of whether these structures are "buildings."
26. Section 48(a)(1), as it read during the years before the Court, provides in pertinent part: [T]he term "section 38 property" means-- (A) tangible personal property, or (B) other tangible property (not including a building and its structural components) but only if such property-- (i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services * * *. Section 1.48-1(c), Income Tax Regs., defines "tangible personal property" as "any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures) * * *." Section 1.48-1(d)(1), Income Tax Regs.↩, defines "other tangible property" as including "any other tangible property (but not including a building and its structural components) used as an integral part of manufacturing * * * [or other qualifying uses] * * *."
27. To some extent, as will be discussed below, there may be some additional portions of the cost that should have been allocated to the machinery or equipment, specifically some of the electrical equipment and any special foundations, pads, or footings for the machinery or equipment.↩
28. There is no evidence in the record from which the Court can determine that any of the disallowed building costs included costs of the particular foundations, pads, or footings for particular machinery or equipment. If the parties have the necessary information, and if any such determination becomes necessary, perhaps they can handle that matter in their Rule 155 computation.↩
29. We are aware that the United States Court of Appeals for the Fourth Circuit has rejected our allocation approach. A.C. Monk & Co. v. United States,686 F. 2d 1058, 1065-1066 (4th Cir. 1982). That court says that any allocation is inappropriate and that the proper approach is to determine whether the electrical system has more general uses than simply operating specific items of machinery and, if so, the system is a structural component of the building and hence nonqualifying. We are not persuaded that our approach is in error. Any appeal in this case will lie to the Seventh Circuit, so we need not reexamine our holding in the Scott Paper Co.↩ case at this time.
30. Rev. Proc. 77-10, 1977-1 C.B. 548, 551, updating respondent's Asset Guideline Class 01.1, contains essentially the same provision: 01.1 Agriculture: Includes machinery and equipment, grain bins, and fences but no other land improvements, that are used in the production of crops or plants, vines, and trees; livestock; the operation of farm dairies, nurseries, greenhouses, sod farms, mushroom cellars, cranberry bogs, apiaries, and fur farms; the performance of agricultural, animal husbandry, and horticultural services.↩